(120 App. Div. 110.)

### SARASOHN v. KAMAIKY et al.

(Supreme Court, Appellate Division, First Department. June 14, 1907.)

1. WILLS—CONTRACT TO BEQUEATH—EXECUTION—DELIVERY—EVIDENCE.

Delivery of a contract to make a will, necessary to make it effectual, is not shown by evidence merely that from the time it was written till after the death of the person who was to make the will it remained in the hands of a third person, the one who wrote it.

2. SPECIFIC PERFORMANCE—DEFINITENESS OF CONTRACT.

The contract of one who owned a third interest in a publishing business, which after his death sold for $94,000, to make a will that there shall be to his son 25 per cent. of said business, and that if, on the father's death, there shall not be left of him with which to satisfy his three grandchildren, said son shall satisfy each with $2,000 or give them 5 per cent. of the said business, is not sufficiently certain and definite as to the interest to be bequeathed for enforcement.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 61–82.]

Laughlin, J., dissenting.

Appeal from Special Term, New York County.

Action by Abraham H. Sarasohn against Rebecca Kamaiky and others for specific performance of a contract to make a will. From a judgment dismissing the complaint on the merits, plaintiff appeals. Affirmed.

See 103 N. Y. Supp. 320.

Argued before INGRAHAM, LAUGHLIN, CLARKE, SCOTT, and LAMBERT, JJ.

Abraham H. Sarasohn (Edward W. S. Johnston, of counsel), for appellant.

Nathan Bijur (G. H. Engelhard, on the brief), for respondent.

CLARKE, J.   The plaintiff, who is the son of Kasryel H. Sarasohn, deceased, brings this action against his mother, his brother, the children of a deceased sister, and the administrators of his father's estate to compel the specific performance of a contract alleged to have been made between himself and his father.   The contract sued on was alleged to have been made on or about the 9th day of February, 1904, was written in the Hebrew language by one Widrowitz, a Hebrew rabbi, was subscribed by Kasryel H. Sarasohn and the plaintiff, and was thereafter and remained in the possession of said Widrowitz until after the decease of said Kasryel H. Sarasohn, was subsequently placed in the possession of one Arnold Kohn under a stipulation, who produced it under subpœna at the trial of certain probate proceedings in the Surrogate's Court and, having been left in the possession of the Surrogate's Court, was produced from the files of that court on the trial of this action.   A translation of said paper writing is as follows:

"Memorial words concluded between Rabbi K. H. Sarasohn and his son Chaim (Hyman):

"(1) Rev. K. H. Sarasohn obligates himself to give his son above mentioned after his wedding, which will take place shortly with his bride-elect, the sum of one hundred dollars each and every month, besides suitable apartments and offices in his house No. 187 East Broadway, without charge.  This obliga-

tion shall continue as long as the above named Hyman has not a share in the business of publishing newspapers of the said Rev. K. H. Sarasohn.

"(2) In the coming spring the said Rev. K. H. Sarasohn will go to Europe. The entire period which he shall remain in Europe his said son shall stand in the place of his father to give (or express) his opinion in the said business of publishing newspapers above mentioned, but in all matters relating to politics and Socialism he shall not have any say.

"(3) The Rev. K. H. Sarasohn obligates himself to make a will, as is required, that after the passing away of the days and years there shall be to the said son Hyman, above mentioned, 25 per cent. of the said business of printing newspapers. This share is only to Hyman personally or to his descendants; but if, God forbid, it shall happen that said Hyman shall have no children surviving him, his wife shall not inherit, only the other heirs of the said Rabbi K. H. Sarasohn. And the house 185 East Broadway there shall be to him one-fourth part.

"(4) If after the passing away of the days of the Rev. K. H. Sarasohn there will not be left of him with what to satisfy the three grandchildren of my daughter Rebecca, of blessed memory, then it is the obligation of the said Hyman to satisfy each with the sum of $2,000 or to give them 5 per cent. of the said business of publishing newspapers.

"(5) All the mortgage that the said Hyman holds on the mother shall be at once void (or shall be canceled). All this is concluded in the presence of the undersigned. We the undersigned have accepted all the foregoing with our good will, with a perfect understanding, and with a full and settled mind. We have come to this signature the 23d of the month of Schebat, 5664, here in New York."

It appears that Rev. Kasryel H. Sarasohn was a devout Hebrew rabbi, and in 1874 founded in the city of New York a business of printing and publishing newspapers in the Yiddish language; that the elder son, Ezekiel, came to this country in 1876, and has always been connected with said newspaper business, and that for a number of years he and his brother-in-law, Kamaiky, who married the only daughter of Kasryel Sarasohn, were partners with the elder Sarasohn in the conduct of that business, each having a one-third interest thereof. The plaintiff came to this country about a year after his elder brother, and although as a boy he did some work in the business, yet he was educated as and is a lawyer and had no interest in the newspaper business. From small beginnings that business had so grown that after the death of Kasryel his one-third interest was sold by his personal representatives to the surviving partners for the sum of $94,-000. It appears that a paper writing, purporting to be the last will and testament of Kasryel H. Sarasohn, was offered for probate in the Surrogate's Court of the county of New York, and that, objection being made, probate was refused on the ground that the said paper was not subscribed by the decedent in the presence of one of the two purported witnesses thereto, was not acknowledged by him to said witness, and the said decedent did not, at the time of making such subscription, or any other time, declare to the said witness that the instrument so subscribed was his last will and testament. That paper writing was as follows:

"As a human being does not know his end, and it is incumbent upon him while he is still alive to provide that his end shall be well, I express my wish in writing how after my death all my property which I have accumulated with divine mercy shall be divided, and I request and command my sons to comply with all that is set forth in this will. (a) At first there shall be paid all debts which are due or shall become due from me until the last penny. (b)

All that I am possessed of, either in property, cash, and my share in the business of newspapers, shall be ten per cent. thereof given to charity; two-thirds here, to wit, to the Talmud Terah, and to the Hachnothah Orchim, and to the Montifiore Home; and one-third balance shall be sent to the Holy Land to the Home for Aged and the Hospital. From the remainder of my share shall be to my son Hyman Abraham 20 per cent., and the balance 13⅓ per cent. shall be equally divided between my son Ezekiel and one-half to the orphans of my daughter Rebecca, of all that remains to the partnership of which to me belongs 33⅓ per cent. (c) To my wife shall be given $50 each week for the balance of her life, and security shall be given to her for the same. (d) To the orphan girl which I have brought up shall be given $500. (e) To my brother 500 rubles shall be given annually. (f) To David Bloch there shall be paid the sum of $300 for an old debt. (g) To Kram shall be paid $333 due on my share. (h) On the note which my son Ezekiel holds against me only $2,000 is due. (i) If it shall be impossible for Kamaiky and my son Ezekiel to continue in partnership with my son Hyman Abraham, for convincing reasons, they have the privilege to pay him his share and shall be determined by three persons consented to by all parties. I do request my sons and son-in-law to publish my father's work 'Ugas Elion,' and I ask them to help my relatives as much as in their power. All of the above I direct of my free will and with clear understanding. In the presence of Rabbi C. H. Widrowitz and Mr. Enoch Wollberg. And I have signed my name this 4th day, the month of Tevath, 5665.

"Kasryal Hirsch Sarasohn.

"Sealed, signed and delivered. In our presence it was signed.

"Chain Jacob Widrowitz.<br/>"Enoch Wollberg."

The learned Special Term, after a trial, entered a judgment dismissing the complaint upon the merits. It seems to me that that judgment should be sustained upon two grounds:

First. That the plaintiff did not sustain the burden of establishing the due execution and delivery of the alleged contract sued upon, so as to make it a valid and enforceable instrument. The father having died without leaving a valid will, the plaintiff seeks to prevent the due distribution of his estate in accordance with the laws of the state governing intestacy, and seeks to substitute for a last will and testament made, published, and declared in accordance with the form and requirements of the law a contract to make a will. As said by the Court of Appeals in Rosseau v. Rouss, 180 N. Y. 116, 72 N. E. 916:

"We have repeatedly held that such a contract must not only be certain and definite, and founded upon an adequate consideration, but also that it must be established by the clearest and most convincing evidence."

There is no evidence showing or tending to show a delivery of this instrument. There is no evidence showing or tending to show that the plaintiff ever had it in his possession for one instant, and there is no evidence showing or tending to show its delivery to any one for him, or for any purpose indicating that Kasryel H. Sarasohn intended it to be an effectual disposition of his property. The evidence is conclusive that from the time it was written until after the death of the elder Sarasohn it remained in the possession of Rabbi Widrowitz, who wrote it. How it happened to be in his possession, why he kept it, why no other members of the family, who apparently were as close and dear to the father as the plaintiff, knew of it, is not explained. And yet the one man in all the world who could have explained how it happened to be drawn, what occurred when it was signed, why it was

not delivered to the plaintiff, and how it happened that it was put and kept in his possession, was not put upon the stand by the plaintiff to clear up this most important lapse in the testimony as to the validity of this instrument, although, as it appears by the record, he sat in court during the trial of this case. It might have been put in escrow to become effective upon some future contingency. It might have been a tentative draft. It might have been drawn to relieve the father of the importunities of the son, or in order that a copy might be made from it for the purpose of influencing those interested in the marriage of the plaintiff and his then affianced bride, without any intention of accomplishing anything except moral suasion. These are a few of the inferences that may be drawn from the fact of the presence in court of the one important witness and that the plaintiff did not or dared not put him upon the stand. A lawyer himself, appearing as attorney for himself, aided by most able and careful trial counsel, it is inconceivable that, if the testimony of Widrowitz would have aided this plaintiff in his efforts to obtain this much larger share of his dead father's estate than he would be entitled to if there were no such valid instrument, he would not have been put upon the stand.

It is a familiar proposition of law that, when it is shown that a party to a litigation has evidence within his control and does not produce it, an unfavorable inference may be drawn. Bleecker v. Johnston, 69 N. Y. 313; Sugarman v. Brengel, 68 App. Div. 377, 74 N. Y. Supp. 167; Kirkpatrick v. Allemannia Fire Ins. Co., 102 App. Div. 329, 92 N. Y. Supp. 466. The importance—I might say the necessity—of the evidence thus withheld is illustrated by the different positions taken by the plaintiff. In his original complaint, verified by him on March 9, 1905, it is alleged:

"That on or about the 9th day of February this plaintiff  * * *  and his said father  * * *  duly made, executed, and delivered to this plaintiff his certain agreement in writing.  * * *"

In his amended complaint, verified by the plaintiff on the 14th of November, 1905, it is alleged:

"That in order to commit to writing a parol agreement to the same effect made in or about the month of October, 1903, on or about the 9th day of February, 1904, the plaintiff  * * *  and the said Kasryel H. Sarasohn  * * *  entered into an agreement in writing bearing date that day.  * * *"

In support of the claim thus made of a prior oral agreement of which this paper was a memorandum, testimony of witnesses as to prior statements of the father was admitted in evidence which otherwise would have been inadmissible. But there is no evidence sufficient to establish the making of any such oral agreement of which this paper is a mere memorandum. This paper was the contract between the parties, if any there was. Yet even in the amended complaint, and in the third paragraph thereof, it is alleged:

"That at the time of the execution and delivery of the said contract so made.  * * *"

The pleader evidently had in mind this necessary element of delivery in the establishment of the validity of such an alleged contract. There was produced upon the trial by counsel for the plaintiff, without

explanation of how it came in his possession, a copy of this paper writing, containing the words "copied from the body of the writing which lies in my hand, letter for letter"; and said additional words bore at the foot thereof the original signature of said Kasryel H. Sarasohn and the signature of Rabbi Widrowitz. This is not sufficient proof of the delivery of the paper writing of which it purports to be a copy, because we again have the fatal omission of explanation by Widrowitz of how the copy happened to be made and what became of it. It does not purport to be a duplicate. It is not the second part of an indenture. It does not bear the signatures of the original parties, for the signature of the elder Sarasohn is attached to the certificate of accuracy of the copy, and not in execution of the paper itself. Delivery would certainly be necessary to make such a paper as the one sued on effectual as a contract. If, without delivery, Sarasohn had made a dozen of such papers, which were kept in his desk under his own control, and there discovered after his death, no effect could be given to any of them. It seems to me, therefore, that the plaintiff has failed in an essential part of his case, and that for that reason alone the judgment was correct.

Second. It is an elementary principle in the exercise of equity jurisdiction that a contract will not be specifically enforced, unless it is certain in its terms. Stanton v. Miller, 58 N. Y. 192; Shakespeare v. Markham, 72 N. Y. 406; Winne v. Winne, 169 N. Y. 272, 59 N. E. 832, 82 Am. St. Rep. 647; Rosseau v. Rouss, supra. It seems to me that this paper, even if, arguendo, it be conceded to have been executed and delivered, was too indefinite and uncertain to permit a court of equity to decree its specific performance. It provided:

"There shall be to the said son, Hyman, above mentioned, twenty-five per cent. of the said business of printing newspapers. * * * (4) If after the passing away of the days of the Rev. K. H. Sarasohn there will not be left of him with what to satisfy the three grandchildren of my daughter Rebecca, of blessed memory, then it is the obligation of the said Hyman to satisfy each with the sum of $2,000 or to give them 5 per cent. of the said business of publishing newspapers."

The plaintiff claims, irrespective of certain shares of stock in the Jewish Press Publishing Company, that, as the value of the business of printing said newspapers has been established by the sale of the one-third thereof for $94,000 to be $232,000, he is entitled to one-fourth thereof—that is, 70,500—which, taken from the $94,000, his father's share, leaves $23,500 to be distributed between his mother, his brother, and his deceased sister's three children. If, however, the 25 per cent. of the business of printing newspapers means 25 per cent. of the share of the elder Sarasohn in the business of printing newspapers, plaintiff would be entitled only to one-fourth of $94,000, or $23,500, instead of $70,500; and if we look at the attempted will, which the plaintiff offers as proof tending to establish the validity of his contract, as an effort upon his father's part to perform, for an indication of the father's interpretation of the intent of the contract, we find that, after providing for the payment of his debts to the last penny, of all that he possesses in property, cash, and his share in the business of newspapers, he gives 10 per cent. to charity, and—

"from the remainder of my share shall be to my son Hyman Abraham 20 per cent., and the balance 13⅓ per cent. shall be equally divided between my son Ezekiel and one-half to the orphans of my daughter Rebecca of all that remains to the partnership, of which belongs to me 33⅓ per cent."

Ignoring, for the moment, the bequest of 10 per cent. to charity, we find that from the remainder of the father's share "of all that remains to the partnership, of which belongs to me 33⅓ per cent.," was given 20 per cent. to Hyman. Twenty per cent. of $94,000, his share, less 10 per cent. for charity, making $84,000, is $16,800. But if the 33⅓ per cent. is to be treated as the principal sum, and the 20 per cent. thereof does not mean 20 per cent. of 100 per cent., but the proportionate share that 20 is to 13⅓ out of a total of 33⅓, we then get 60 per cent. of $84,000 or $50,400; so that, upon these constructions we get as his possible share these amounts: $70,500, or $23,500, or $16,800, or $50,400. Under section 4 of the alleged contract the obligation is to give the three children of Rebecca $2,000 each—that is, $6,000—or 5 per cent. of the business of publishing newspapers. This 5 per cent. would be $14,100, if it is to be construed as the plaintiff asks us to construe the third clause—that is, 5 per cent. of the whole business; or it would be $4,700, if it is to be construed as 5 per cent. of Kasryel's one-third of the business; or, if calculated, as provided by the will, as one-half of 13⅓, it would be $11,800, treating the 33⅓ as a whole, or it would be $6,720, if we treat it as the literal reading would require—one-half of 13⅓ per cent. of this one-third of the partnership.

If we consider the shares of stock in the Jewish Press Publishing Company, which are conceded to come within the phrase of the alleged contract "business of printing newspapers," these difficulties are presented: The total number of shares issued by the corporation was 390. According to the plaintiff's interpretation, he would be entitled to 25 per cent. thereof, or 97½ shares. But Kasryel Sarasohn owned but 67 shares. The plaintiff suggests no satisfactory solution of this dilemma. If the 25 per cent. is to be calculated on the 87 shares, he would be entitled to 21¾ shares. But this interpretation of the paper he strenuously opposes. These varying results, and there are other possible combinations of figures suggested by the various counsel, demonstrate, I think, that it is impossible for a court, asked to compel the specific performance of a contract, to determine with that precision which is required in such an action what the contract really means. Without considering the many other questions presented by this record, we hold that the plaintiff has failed to prove the paper writing sued on to be a valid executed and delivered contract so certain and definite in its terms as to permit a decree of specific performance thereof.

It follows that the judgment and order appealed from should be affirmed, with costs.

SCOTT and LAMBERT, JJ., concur. INGRAHAM, J., concurs on first ground stated in opinion.

LAUGHLIN, J. (dissenting). I am of opinion that the execution of the contract was sufficiently shown, and that, reasonably construed,

it is not indefinite, but shows that the decedent agreed to give plaintiff an interest equal to 25 per cent. of the entire business, and not merely 25 per cent. of his $33\frac{1}{3}$ per cent.