CHARLES B. ROSSEAU, an Infant, by J. ARTHUR FISCHER, His
  Guardian ad Litem, Respondent, *v*. PETER W. ROUSS,
  as Executor of CHARLES BROADWAY ROUSS, Deceased,
  Appellant.

1. EVIDENCE — ORAL CONTRACT OF DECEDENT MUST BE ESTABLISHED
BY CLEAREST AND MOST CONVINCING PROOF. An oral contract alleged
to have been entered into by a decedent prior to his death, whereby it is
claimed that in consideration of a promise by the mother of a child, of
whom he was alleged to be the putative father, that she would "care for
and provide for the support and maintenance" of the child for a certain
period, he promised to pay to and settle upon the child, at the expiration
of the term, the sum of $100,000, cannot be established by parol testimony
given by interested witnesses, but must be proved by the clearest and most
convincing evidence.

2. SAME — ONE FROM WHOM PARTY DERIVES HIS INTEREST DISQUALI-
FIED FROM TESTIFYING UNDER SECTION 829 OF CODE OF CIVIL PRO-
CEDURE. Where, after the death of the alleged father, in an action by
the child to enforce such a contract, it appears that the promise of the
mother to the father, in consideration of his promise to pay the child,
alone furnished such consideration as there was in support of the alleged
agreement, and the sole interest of the child is thus derived from and
through the mother, she is disqualified, under the provisions of section 829
of the Code of Civil Procedure, from testifying to the alleged agreement,
since the statute forbids one from whom a party derives his interest from
testifying to a personal transaction with a decedent in an action to enforce
such interest against the decedent's estate.

*Rosseau* v. *Rouss*, 91 App. Div. 230, reversed.

(Argued November 28, 1904; decided December 30, 1904.)

APPEAL from a judgment of the Appellate Division of the
Supreme Court in the first judicial department, entered Feb-
ruary 29, 1904, affirming a judgment in favor of plaintiff
entered upon a verdict and an order denying a motion for a
new trial.

The nature of the action and the facts, so far as material,
are stated in the opinion.

*Austen G. Fox*, *W. J. Townsend* and *John J. Rooney* for
appellant. Eva S. F. Rosseau, the mother of the plaintiff, was

a person interested in the event of the action, and an incompetent witness. (*Embler* v. *H. B. Ins. Co.*, 158 N. Y. 431; *Durnherr* v. *Rau*, 135 N. Y. 219; *Vrooman* v. *Turner*, 69 N. Y. 280; *Connelly* v. *O'Connor*, 117 N. Y. 91; *Eisenlord* v. *Clum*, 126 N. Y. 552; *Munz* v. *Colvin*, 35 App. Div. 188; *Church* v. *Howard*, 79 N. Y. 415; *Miller* v. *Montgomery*, 78 N. Y. 282; *Wilcox* v. *Smith*, 26 Barb. 316; *Lutchford* v. *Lord*, 132 N. Y. 465.)

*Charles A. Decker* and *James J. Allen* for respondent. The mother was a competent witness to prove the contract, and the exceptions taken to the admission of her testimony present no ground for reversal. (*Connelly* v. *O'Connor*, 117 N. Y. 91; *Healey* v. *Healey*, 55 App. Div. 315; *Eisenlord* v. *Clum*, 126 N. Y. 552; *Godine* v. *Kidd*, 64 Hun, 585; *Farrar* v. *F. L. & T. Co.*, 85 App. Div. 478; *Combs* v. *Jackson*, 2 Wend. 153; *Fonda* v. *Van Horne*, 15 Wend. 631; *Beardsley* v. *Hotchkiss*, 96 N. Y. 201; *Brandagie* v. *Hale*, 13 Johns. 125; *Van Wezel* v. *Wyckoff*, 3 Sandf. Ch. 528.)

VANN, J.   Mainly upon the testimony of his mother, the plaintiff, a lad not yet in his teens, has recovered more than one hundred thousand dollars from the estate of his putative father by the judgment now before us for review.   The recovery was founded upon an alleged oral agreement made between the father and mother on the 8th of June, 1901, whereby, as it is alleged in the complaint, in consideration of her promise "to care for and provide for the support and maintenance" of the son until the 4th of June, 1902, the father "promised and agreed to pay to and settle upon the" son "the sum of one hundred thousand dollars on the" day last named for his "benefit, support and maintenance."

The story of Mrs. Eva Rosseau, the mother, as told by her at the trial, is in substance as follows : Her real name is Eva Figgett, but she assumed the name of Rosseau on the 29th of September, 1891, for some purpose that she did not disclose. Meretricious relations sprang up between herself and Mr.

Rouss, the decedent, in December, 1890, and continued until May, 1901. The plaintiff was born on the 5th of June, 1892, and the decedent in many ways and on various occasions acknowledged that he was his father. Commencing in 1896, he made an allowance of $70 a week for the support of the mother and child, and this continued until he died on March 3, 1902. He was engaged in the mercantile business in the city of New York, and while it does not appear how much he was worth, he repeatedly stated that he was a millionaire. He was deeply attached to the plaintiff and openly associated with him and to some extent with his mother, although until 1898 he had a wife and was living with her in the same city where he kept Mrs. Rosseau as his mistress. He had legitimate children, but whether more than two, a son and a daugher of full age, who were mentioned in the evidence, did not appear.

In the spring of 1901 there was a quarrel between the father and mother about another woman, and she told him that she intended to leave the city and take the plaintiff with her, in order to rear the child amidst better surroundings. He strenuously objected, and said that she might go but he did not want her to take the boy with her; that while he preferred she should not go, if she did, he wanted the boy to remain in the city. He then continued, according to the statement of Mrs. Rosseau : "Remember, that if you do so, I will settle upon Charley when he is ten, the sum of $100,000. It is nothing. I am a rich man, my children will have plenty. Plenty. I don't mind that little amount of money. I will give it to Charley for his support, but he must be reared as my son. He must have the best that the money that I now give provides. I want him to have the best raising; I want him to be raised a Christian gentleman." She said : "I don't want to stay here; I am tired of it. I am tired, but if it is best for my boy, and if you will give him $100,000, as you say, I submit to youı view, but I don't want to, yet I will, for his sake."

Shortly afterward as he handed Mrs. Rosseau two hundred dollars to enable her and the boy to visit the exposition at Buffalo, he said: "I won't give you any more money than

this.    Remember my contract, that you bring the boy back.
Let me have the pleasure of his society.    My life is a hard
one — sad.    I am an old man; I am lonely; I am blind.    The
music of his voice is the sweetest I hear.    I want him.    I
miss him.    I need him.    Don't deprive me of this one favor.
Bring him back.    Do as I tell you.    Keep him in the city,
and when he is ten I will give the money that I promised him
— $100,000."

In September, 1901, the following conversation is said to have
occurred : " I said that Charles had been ill; that he had had
an abscess; blood poison had formed, he had been taken to
the hospital.    Dr. Gibb had operated on him.    That the bills
were very large.    The school was expensive, he was growing,
and that I wanted more money.    He said : ' My love, I think
$10 a day is enough, don't you ? '    I said, ' Hardly, under the
circumstances; that I should like to have an increase of
money just at that time.'    But he objected.    He says : ' Pay
your bills out of the money I give you regularly — yours and
the boy's.    The time now is very short.    Charles is nine — he
will soon be ten.    Be satisfied with the amount that you now
have, because in a few months, when he is ten, he will have
$100,000 that I will give him.' "

On her cross-examination she testified that her relations
with Mr. Rouss continued to be cordial and pleasant up to
the time of his death, although she admitted that in May,
1900, by the aid of a policeman she was put out of his house
on Fifth avenue, where she had called to object to his atten-
tions to another woman.    She also recalled an occasion when
Rouss was riding with some woman and she " tried to get in
and did get in " the carriage.    He did not repulse her but
left the carriage with his companion, leaving Mrs. Rosseau
the sole occupant.

Referring to the interview of May, she stated the promise of
Mr. Rouss as follows : " I own an establishment down on Broad-
way ; I have a little money, and my boy shall have the benefit
of it.    He is, when he is ten years of age, provided you do as
I tell you, to have $100,000 on his tenth birthday — the 5th

of June. * * * He said when Charles is ten, he is to go down into the store and be a partner in the store with his brother."

She did not frequently have disputes with him in regard to the amount of money he allowed her, or make frequent demands for more than the ten dollars a day, "not after this contract was made by him."

After the death of Mr. Rouss she made a claim against his estate for dower, on the ground of an alleged common-law marriage with him after the death of Mrs. Rouss. In March, 1902, she was paid $23,000 in settlement of that claim, but she did not say anything then or previously about the claim of her son for $100,000, which was not presented to the executor until July, 1902. At first she said she did not have it in mind, but later admitted that she thought of it although she said nothing about it. She had been told by her counsel that the claim of her son would not be affected by the release of her claim for dower. She did not consult her counsel in relation to the claim of the boy, or tell him that the boy had a claim, but " he told me ; he suggested it." She further testified that she kept and supported the boy in the city as Mr. Rouss directed, but it did not appear that she had any means of supporting either herself or the child, except the allowance of ten dollars a day. She did not testify that she had any property of her own or that she expended any money of her own in supporting the plaintiff or in keeping him in the city of New York, as the decedent requested and as she had done for nine years. So far as appeared her compliance with that request for less than a year was the only consideration to support the contract.

Mrs. Rosseau was the only witness who was present when the alleged agreement was made, but her story was corroborated, to some extent, by three witnesses who testified to admissions said to have been made by the decedent to the effect that he had made a contract resembling the one sworn to by her.

Thus, the evidence relied upon to establish the contract

is, *first*, the testimony of the mother, who tried to swear $100,000 into the pocket of her own child, and, *second*, the testimony of witnesses who swear to the admissions of a dead man. The former is dangerous; the latter is weak, and neither should be acted upon without great caution. We have repeatedly held that such a contract must not only be certain and definite and founded upon an adequate consideration, but also that it must be established by the clearest and most convincing evidence. We have been emphatic in condemning these agreements, because they "have become so frequent in recent years as to cause alarm." We have been rigid and exacting as to the sufficiency of the evidence to establish them, and have condemned the proof thereof "through parol evidence given by interested witnesses." As "such contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises," we have declared that they "should be in writing, and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses." (*Hamlin* v. *Stevens*, 177 N. Y. 39; *Mahaney* v. *Carr*, 175 N. Y. 454; *Ide* v. *Brown*, 178 N. Y. 26; *Edson* v. *Parsons*, 155 N. Y. 555; *Shakespeare* v. *Markham*, 72 N. Y. 400.)

We do not deem it necessary to pass upon the sufficiency of the evidence by which it is claimed that the contract was established, or the sufficiency of the consideration alleged, as we think that the judgment should be reversed because Mrs. Rosseau, the principal witness for the plaintiff, was incompetent to testify under section 829 of the Code of Civil Procedure. Her competency is challenged on three grounds: *First*, because she made the contract and furnished the sole consideration therefor, and the plaintiff derived his interest therein from her. *Second*, because she employed attorneys to prosecute this action, and is bound to pay them for their services. *Third*, because she deposited the sum of $250 as security for the costs of the defendant if he should succeed, although

a bond to secure such costs was filed, but whether before or after the deposit does not appear.

The first ground is the only one that we shall consider. Mrs. Rosseau made the contract with Mr. Rouss and no one else had anything to do with it. While we do not hold that there was any legal consideration, so far as there was any she furnished it. Either there was no consideration or the plaintiff's interest is derived from his mother. Unless she had an interest in the performance of the contract there was no consideration therefor, as a promise for the benefit of a third person must not only be supported by a sufficient consideration, but the one furnishing it must have a legal interest in the performance of the promise. (*Embler* v. *Hartford Steam Boiler Ins. Co.*, 158 N. Y. 431, 436; *Durnherr* v. *Rau*, 135 N. Y. 219, 222; *Vrooman* v. *Turner*, 69 N. Y. 280, 284.) The one who furnished the consideration in this case is under a legal obligation to support the plaintiff until he becomes of age or self-supporting. (2 Kent's Com. [13th ed.] 215.) If he should die intestate and without issue she would inherit from him. (Real Property Law, § 289.) If he succeeds in collecting the large sum involved it will be, according to the complaint and the contract, for his support and maintenance and she can apply to the court for an allowance therefrom for that purpose, which would relieve her wholly or in part from her legal liability. Even if such an allowance cannot ordinarily be demanded as a matter of right, the fact that such applications are usually granted is not without significance. The right to make the application cannot be denied, nor can it be asserted in view of the practice of the courts and of the expression of purpose by the father in making the contract, that the result of such an application would be uncertain.

While Mrs. Rosseau is not a party to the action, she made the contract which is the sole foundation for the action. She created the cause of action and she alone furnished such consideration as there was for the contract on which it is founded. There is a distinction between a contract by a putative father to pay a third person for the mere support of his natural child,

which was the case in *Todd* v. *Weber* (95 N. Y. 181), and an agreement with the mother to settle a fortune upon her child which requires something more than a moral obligation to sustain it. While it was the duty of Mrs. Rosseau to support her own child, she was entitled to his custody and it is her promise in relation to his custody by agreeing to keep him for a very short time in a particular place, that constitutes the consideration, if there is any.

The plaintiff derives his title from her, because upon her promise to the decedent, the latter promised to pay the plaintiff the legal equivalent of the consideration furnished by her, and she had the right to have the promise run to him instead of to herself. The plaintiff made no contract with his father, and if the promise to pay him $100,000 is not supported by a sufficient consideration it cannot be enforced. What, if anything, vitalized the contract is the consideration furnished by the mother for the promise of the father to pay the plaintiff, whose interest thus comes through her. From what other source did he get it? He did not create it himself nor furnish the consideration for it himself. His mother created all his rights by her promise to his father, made in consideration of his promise to her for the benefit of the plaintiff. If there was no consideration there was no contract, but if there was a consideration, however slender it may be, it was furnished by the mother.

The argument may be summarized as follows: As the plaintiff did not make the contract himself he must have derived his interest therein from some one. He did not derive it from his father, because his father could not make a promise to himself nor contract with himself for the plaintiff's benefit. The father made no promise to the plaintiff, but he promised the mother to pay the plaintiff the sum named. That, however, was not enough; for such a promise is not binding without a consideration. The plaintiff furnished no consideration for the promise and would have had no interest in the contract unless a consideration had been furnished by some one. His mother furnished the sole consideration and

the promise was made by the father to the mother to pay the son, who thus derived his interest from her. The statute forbids a party or a person interested in the event of an action, or one from whom a party derives his interest, from testifying to a personal transaction with a dead man. It is a wholesome statute, designed to quiet the voice of the living party to a contract when the other party is dead and cannot speak.

The respondent relies upon *Connelly* v. *O'Connor* (117 N. Y. 91) and *Bouton* v. *Welch* (170 N. Y. 554), but we do not regard either as controlling, because in both the promise was made to or in the presence of the party to be benefited, who furnished a consideration therefor. In *Connelly* v. *O'Connor* the promise was made by the father of a *filius nullius* directly to the plaintiff, who was not the mother and was under no obligation to support the child, to pay her for supporting him, and the action was brought to recover for care and maintenance already furnished on the strength of that promise.

In *Bouton* v. *Welch* the promise was made to the husband in the presence of the wife in consideration of a deed from both husband and wife. The release of her inchoate right of dower was a sufficient consideration flowing directly from her to the one who made the promise. As no further consideration was needed to support it her interest was direct and not derivative, and that is the only ground upon which that decision can stand. Here the promise was not made to the plaintiff and the consideration did not come from him. The promise was made to his mother for his benefit, she furnished the consideration for his benefit and she had an interest that the promise should be performed, because it would result in the creation of a special fund for his " benefit, support and maintenance ;" otherwise there was no contract.

We think that Mrs. Rosseau was an incompetent witness for her son against his father's estate, and that the objections and exceptions taken to the admission of her testimony require us to reverse the judgment and order a new trial, costs to abide event.

CULLEN, Ch. J.  I concur in the opinion of Judge VANN that Eva Rosseau, the mother of the plaintiff, was the party under whom the plaintiff claimed, and, therefore, under section 829 of the Code of Civil Procedure, not a competent witness to personal transactions between herself and the defendant's testator.  I think, however, that no sound distinction can be drawn between this case and our decision in *Bouton* v. *Welch* (170 N. Y. 554).  It is true that in that case the defendant released her dower by joining in the execution of the deed of her husband.  But the trial court found that the agreement out of which the defense arose was made by the plaintiff's testator, not with her, but with her husband. No matter upon what ground, however, the case might have been decided, as a matter of fact it was actually decided on the proposition that where a third person sues on a contract made for her benefit she does not derive her interest from the party who furnishes the consideration for said contract.  We are now about to hold the exactly contrary doctrine, and I think it but fair to the profession that under such circumstances we should expressly retract the *Bouton* case, not seek to distinguish it or leave it as a false light to deceive the unwary.

CULLEN, Ch. J. (in memorandum), O'BRIEN and HAIGHT, JJ., concur; GRAY, BARTLETT and MARTIN, JJ., dissent on opinion of PATTERSON, J., below.

Judgment reversed, etc.