<hr />

(81 Misc. Rep. 579.)

### In re HIGGINS' ESTATE.

(Surrogate's Court, Cattaraugus County. July, 1913.)

1. COURTS (§ 201*)—PROBATE COURTS—INCIDENTAL JURISDICTION—STATUTORY PROVISIONS—"ASCERTAIN."

    A will created four trust funds for the widow and three children of the testator, and provided that on the death of any of them the principal of the fund should fall into the residuary estate. The widow gave a voluntary assignment of an undivided two-ninths interest in the residuary estate to the eldest son, and she and the son entered into a contract in which they expressed a desire that the assets of the estate should be kept intact, and directed the executors of the will to transfer them to a holding corporation to be organized for that purpose, in which the parties were to hold stock in the proportion of their respective interests. Thereafter the son died, and the trustees instituted proceedings for an intermediate settlement of their accounts as to the trust fund of which he was the beneficiary. Held, that Code Civ. Proc. § 2472a, authorizing the surrogate, upon a judicial accounting or proceedings for the payment of a legacy, to ascertain the title to any legacy or distributive share, when construed in the light of the previous legislation extending the jurisdiction of that court, gave the surrogate jurisdiction to construe the assignment and the contract creating the corporation; the word "ascertain," which ordinarily means simply to become apprised of the existence of an undisputed fact, being used in that statute as the equivalent of "hear, try, and determine."

    [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 86, 87; Dec. Dig. § 201.*

    For other definitions, see Words and Phrases, vol. 1, pp. 530, 531.]

2. WILLS (§ 740*) — RIGHTS OF LEGATEES — ASSIGNMENTS OF LEGACY — CONSTRUCTION.

    The assignment to the son transferred to him an interest in the principal of the trust fund of which he was beneficiary, and which, by the ex-

<hr />

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

press terms of the will, was vested in the assignor as a part of the residuary estate subject to the terms of the trust, notwithstanding the insistence of the assignor that it was not her intention to transfer such fund.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1888–1895; Dec. Dig. § 740.*]

3. WILLS (§ 740*)—AGREEMENTS BETWEEN LEGATEES—CREATION OF HOLDING CORPORATION.

The contract creating a holding corporation required a transfer of the interest of the son in the trust fund to the corporation.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1888–1895; Dec. Dig. § 740.*]

4. WILLS (§ 743*)—AGREEMENTS BETWEEN LEGATEES—CREATION OF HOLDING CORPORATION—EFFECT.

Where the agreement for the transfer of the residuary estate to the corporation had been fully consummated before the death of the son, except for the formal transfer of the funds upon the termination of the trust, it was not necessary for the executrix of the son, who, as wife, had joined in that contract, to execute any formal transfer of such funds, since equity regards as done that which ought to be done.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1907–1910; Dec. Dig. § 743.*]

5. TRUSTS (§ 303*)—PROCEEDINGS FOR SETTLEMENT—NATURE OF PROCEEDING.

The proceeding for the settlement of the trustees' account was not an action by the holding corporation to enforce a contract for its benefit, but the settlement of a controversy between the widow and the executrix of the son, in which the corporation was interested only as a recipient of the fund, and to which it was not a necessary party.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 420; Dec. Dig. § 303.*]

Proceedings for the intermediate judicial settlement of the accounts of the testamentary trustees under the will of Frank Wayland Higgins, deceased. Account settled as filed.

Hastings & Larkin, of Olean, for accounting trustees.

John K. Ward, of Ellicottville, for widow, Kate C. Higgins, F. Harrison Higgins, Josephine Higgins Hovelaque, and the Higgins Co.

Edgar G. Pratt, of Redlands, Cal., for Elizabeth B. Higgins, individually and as special guardian for Katherine H. and Lucia C. Higgins, infants.

Philip Carpenter, of New York City, for Elizabeth B. Higgins, as executrix of the last will and testament of Orrin Thrall Higgins, deceased.

DAVIE, S. Frank Wayland Higgins, late of the city of Olean, died in February, 1907, leaving a will dated August 6, 1904, which was admitted to probate February 18, 1907. Letters testamentary were thereupon issued to N. V. V. Franchot and Frank L. Bartlett, the executors therein named, who have fully administered upon the estate and procured a final judicial settlement of their accounts as such executors on the 18th day of November, 1908.

The testator left him surviving his widow, Kate C. Higgins, two sons, Orrin T. and F. Harrison Higgins, and one daughter, Josephine Higgins Hovelaque, all of full age, his only heirs at law and next of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

kin. The son Orrin, being a resident of California, died September 12, 1912, leaving a will, which was duly admitted to probate in that state, and letters testamentary were issued thereon to his widow, Elizabeth B. Higgins. He left him surviving, besides his widow, two minor daughters, Katherine H. and Lucia C. Higgins.

Aside from several general legacies, the will creates six distinct trusts, one of $50,000 for the widow and each of the three children, one of $4,000 for the benefit of Emily Higgins, and one of $10,000 for the maintenance and beautifying of the public park in the city of Olean on the north side of the Higgins homestead. The petitioners, Franchot, Bartlett, and Smith, were appointed trustees, and the executors were directed to set apart and turn over to them, as soon as practicable, from the funds of the estate, a sufficient amount to constitute the trusts so provided for, which was accordingly done. The income derived by the trustees from the investment of each of the $50,000 trusts was directed to be paid by them to the respective beneficiaries during their lives. The residue of the estate was given to the widow absolutely.

On the 21st day of May, 1907, Kate C. Higgins, the residuary legatee, executed, acknowledged, and delivered to the son Orrin T. an instrument in writing, of which the following is a copy:

"Know all men by these presents, that whereas, I, Kate C. Higgins of Olean, in the state of New York, am possessed of an estate as residuary legatee and devisee of my late husband, Frank Wayland Higgins, which I am desirous of settling in part on my son, Orrin Thrall Higgins, in order that he and his issue may to some extent be provided for out of the estate of his late father.

"Now, I, the said Kate C. Higgins, in consideration of the love and affection which I bear to my said son, and in further consideration of the sum of one dollar ($1.00), lawful money of the United States, to me paid before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, do bargain, sell, assign, transfer, and set over unto my said oldest son, Orrin Thrall Higgins, two-ninths of the residuary estate which came to me from his father, the late Frank Wayland Higgins, whether such residuary estate be real, personal, or mixed, my intention being that my said son, Orrin Thrall Higgins, shall be vested now and at the present time by virtue of this instrument, with two-ninths of the said residuary estate, to have and to hold the said two-ninths unto the said Orrin Thrall Higgins, his executors, administrators, and assigns, forever.

"I further covenant to and with the said Orrin Thrall Higgins that I will, pursuant to the premises, make, execute, and deliver any further deeds, covenants, and conveyances which may be requisite or necessary, in law or in equity, effectually to vest in him or his heirs or assigns the title to his portion of the real estate received by me as residuary legatee aforesaid, and hereby intended to be transferred and set over unto him.

"In witness whereof, I have hereunto set my hand and seal this 21st day of May, in the year of our Lord 1907. Kate C. Higgins. [L. S.]

"In presence of Harry A. Hinckley, Notary Public."

On the 25th day of November, 1908, the widow, Kate C. Higgins, and the son Orrin entered into a contract in writing, reciting the making of the assignment above quoted, and further stating that it was not desired or deemed advisable for the executors to exercise the power of sale given them by the will or to convert the stocks and securities constituting the residuary estate into money, but that they should turn the same over as specified in such agreement, and further

reciting that the said parties were then procuring the organization of a corporation under the laws of the state of Minnesota, to be known as the Higgins Company, with an authorized capital stock of $500,-000, and that the province and functions of such corporation were to "take, acquire, own, and hold all of the residuary property and estate which shall come to the parties hereto under said will, it being deemed to be advisable by the parties hereto that such property should remain and be kept intact for the present," and which said agreement, after such recitals, contained the following provision:

"Therefore, for a valuable consideration by each to the other in hand paid, the receipt whereof is hereby acknowledged, it is mutually covenanted and agreed between the parties hereto that all of the property and estate, both real and personal, which shall belong to and become a part of the residuary estate under the twenty-second paragraph of the will of the said Frank W. Higgins, shall be jointly by the parties hereto, or by the said executors, transferred or conveyed to the said Higgins Company, and in payment therefor the parties hereto shall accept and take capital stock of the said Higgins Company, the party of the first part to have and receive seven-ninths and the party of the second part to have and receive two-ninths of such capital stock, as representing her or his interest in the property so transferred and conveyed, and either party hereto shall, upon request of the other, execute all such writings, transfers, conveyances, or assignments as may be necessary to so transfer or convey such interest, and to carry into effect the terms of this agreement. This agreement shall apply to and bind the heirs, executors, administrators, and assigns of the respective parties hereto."

The wife of the son Orrin, by a writing at the end of such agreement, approved of the same and agreed to join with her husband in the execution of any deed necessary to carry such agreement into effect, and for the purpose of conveying any contingent dower right she might have in such property.

The incorporation of the so-called Higgins Company was perfected by the filing of the requisite certificate in the office of the secretary of state of the state of Minnesota, November 10, 1908, and in the office of the register of deeds of St. Louis county, Minn., November 11, 1908, pursuant to the provisions of chapter 58 of the Revised Laws of the state of Minnesota for the year 1905. The incorporators named in the certificate were Kate C. Higgins, Orrin T. Higgins, Frank L. Bartlett, N. V. V. Franchot, and Allen B. Williams, who also constituted the first board of directors. Thereupon all of the real estate belonging to the residuary estate was duly conveyed to the Higgins Company, and all the securities, aside from those set apart to create the several trust funds, were actually delivered and turned over to the corporation. A single share of stock was issued to each of the directors, Franchot, Bartlett, and Williams, for the sole purpose of qualifying them to act as directors, and such portion of the balance of the capital stock as the parties deemed expedient in the proportion of two-ninths and seven-ninths was issued and delivered to Orrin and Kate C. Higgins, respectively; the balance of the capital stock being retained and held in the nature of treasury stock.

It is asserted on behalf of the residuary legatee that the assignment of May 21, 1907, did not transfer to Orrin T. any interest in the principal of this trust fund; that it only gave to him an undivided two-ninths interest in such portions of the residuary estate as were then

actually in the possession and under the control of the residuary legatee. On the contrary, the executrix of the Orrin T. Higgins will claims that by virtue of such assignment her husband became the owner of a two-ninths interest in this fund, and that such interest was not transferred to the Higgins Company by the contract of November 25, 1908, and that she is now entitled to such interest in money. These are the questions for determination upon this accounting. They must be determined in order to make the proper disposition of the securities constituting the trust fund. These conflicting claims can only be determined from a construction of the two contracts above referred to in connection with the provisions of the will of the decedent. Has the Surrogate's Court jurisdiction upon this accounting to make such construction?

[1] The Surrogate's Court is one of limited jurisdiction. It possesses no powers or authority other than those specifically conferred or necessarily inferentially granted. Section 2472 of the Code of Civil Procedure defines the general jurisdiction of the Surrogate's Court, and section 2481 specifies in detail its incidental powers. It has been frequently held that under the provisions of these two sections the Surrogate's Court had no jurisdiction to determine controversies of the character suggested, such questions being exclusively within the province of a court of general jurisdiction. Matter of Union Trust Co., 175 N. Y. 304, 67 N. E. 614; Matter of Wagner, 119 N. Y. 28, 23 N. E. 200. But section 2472a of the Code was enacted and became operative September 1, 1910, providing as follows:

"The Surrogate's Court has also jurisdiction upon a judicial accounting or a proceeding for the payment of a legacy to ascertain the title to any legacy or distributive share, to set off a debt against the same and for that purpose ascertain whether the debt exists, to affect the accounting party with a constructive trust, and to exercise all other power, legal or equitable, necessary to the complete disposition of the matter. He must order the trial of any controverted question of fact of which either party has constitutional right of trial by jury and seasonably demands the same."

What is the meaning and scope of this new section? In statutory construction where the phraseology of the act is ambiguous and indefinite, the legislative intent must be derived, not only from the phraseology itself, but from the surrounding circumstances and conditions inducing the legislation. Statutes should be construed and interpreted according to the nature and most obvious import of the language employed, without resorting to strained or forced construction for the purpose of limiting or enlarging their operation, having in mind the purpose evidently sought to be accomplished. In the past much delay and serious inconvenience in the administration of estates have been experienced in consequence of the limited powers of the Surrogate's Court. Conflicting claims to distributive shares have often arisen, making it necessary to delay proceedings in that court to await the ultimate determination of such controversies by a court of general jurisdiction. This situation has occasioned multiplicity of litigation, increased expense, vexatious procrastination, and accentuated the necessity for conferring upon Surrogates' Courts the same power and authority possessed and exercised by the former Chancery

Courts in their supervision of the administration of decedents' estates. The tendency of modern legislation has been to meet this demand to some extent. Year after year the jurisdiction of Surrogates' Courts has been enlarged. For illustration, by the provisions of chapter 595 of the Laws of 1895 these courts were given jurisdiction to hear, try, and determine disputed claims against estates upon the stipulation of the parties. By the amendment to section 2624 of the Code these courts were authorized, in connection with the probate of a will, to determine the validity, construction, and effect of any provision of the will, whether it related to real or personal estate. Many other instances might be cited.

It must be conceded that it was the design of the Legislature in the enactment of section 2472a to enlarge to some extent the then existing jurisdiction of Surrogates' Courts. In construing the phraseology of this section it is evident that it is somewhat inartistically drawn. Standing alone it might be difficult of interpretation and application. The use of the word "ascertain" in the first paragraph is somewhat unfortunate. The word "ascertain," in its commonly accepted signification, means simply to become apprised of the existence of an undisputed fact, and in this instance to learn who the conceded legatees and distributees were. Surrogates' Courts have always possessed that power as a necessary incident to distribution. It was evidently the intent to give these courts by the provisions of this new section some greater authority than that of merely ascertaining some existing fact. It has used the term "ascertain" as equivalent to "hear, try, and determine," and for that purpose it is provided that the Surrogate's Court "shall exercise all other powers, legal and equitable, necessary to a complete determination of the matter," and, in order that the provisions of this act should not contravene any constitutional right of trial by jury, the concluding sentence provides for a jury trial in a proper case, when seasonably demanded. The precise scope of this new legislation, however, is a subject of controversy. The Law Reform Association of the City of New York maintains that its effect is to give to Surrogates' Courts the right "to exercise all powers, legal or equitable, necessary to the complete disposition of the accounting." N. Y. L. J. April 28, 1911. On the contrary, in Matter of Clyne, 72 Misc. Rep. 593, 131 N. Y. Supp. 1090, the surrogate holds that the only additional power conferred by this section is the right to determine the title to a legacy or distributive share, to set off a debt against the same, to ascertain whether the debt exists so as to affect the accounting party with a constructive trust in regard to the same. The words "shall exercise all other powers, legal and equitable," etc., are not susceptible of general application, but relate simply to the determination of the title to a legacy or distributive share and the offsetting of debts against the same.

In Matter of Cary, 77 Misc. Rep. 602, 138 N. Y. Supp. 682, the question involved was the determination of the validity of a contract for voluntary settlement and distribution of the assets of the estate, entered into between the executor and the residuary legatee, where the latter asserted that the execution of such contract was procured

through fraudulent representations in regard to the extent of the estate. The Surrogate's Court held that under the provisions of section 2472a it had power to determine that question. Other questions were involved in that case, and, while the decision of the surrogate was affirmed by the Appellate Division, such affirmance was without opinion and, therefore, affords no light upon the question of the construction of this new section.

Without entering upon any academic discussion of the possible general scope of this new section, it will be held that for the purposes of this accounting the Surrogate's Court has jurisdiction to construe the two contracts in controversy and to determine who now holds the title to this trust fund.

[2] Did the assignment of May 21, 1907, above quoted, transfer to Orrin T. Higgins any interest in the principal of this trust fund? It is strenuously insisted on the part of the residuary legatee that it was not her design or intention in executing this voluntary transfer to her son to give him any interest in the principal of the trust fund of which he was then enjoying the income, or in the principal of either of the other trusts created for the benefit of the other children; that the purpose of such assignment was to transfer a two-ninths interest in that portion of the residuary estate which had then come into her possession and under her control, and nothing more; and in this connection attention is called to the following phraseology of the first paragraph of the will.

"Upon the death of any child the principal fund of $50,000.00 so set apart for the use of the one so dying *shall become* a part of my residuary estate."

The difficulty with such condition, however, arises from the fact that the legal signification of the term "residuary estate" has become well understood, and it must be assumed that the testator knew the meaning of the term when he employed it in his will, and that Mrs. Higgins comprehended its import when she used it in the assignment. The will provides that:

"All the rest and remainder of my property of whatever name, nature or kind, I give, devise and bequeath unto my wife, and I do further direct and declare that the several principal sums or trust funds which have been herein directed to be set apart shall constitute a part of the residuary estate unless otherwise directed, and be paid to the residuary legatee and devisee upon the happening of the event which shall terminate the rights of the beneficiaries to the use and income of such principal sums respectively, and I hereby declare such residuary legatee and devisee to have a vested right and interest in and to such principal sum immediately upon my decease, subject, however, to the use and income as hereinbefore provided."

The title to the principal of this fund was not held in abeyance or given to the trustees, but vested absolutely in the residuary legatee upon the death of the testator and the probate of his will; it was bequeathed directly to her in her capacity of residuary legatee. Her title to the principal is not impaired by the fact that the earnings of this fund were to be paid to the son during his lifetime. The provisions of the assignment are extremely specific, certain and definite. It transfers to the son absolutely a two-ninths interest in the entire residuary estate, of whatever it might consist, whether real, personal, or mixed.

In view of the specific characterization by the testator of the principal of this fund as a part of his residuary estate, and in view of the fact that the provisions of the assignment apply to every portion of the residuary estate, whether in possession or reversion, no substantial reason can be discovered for sustaining the contention of the residuary legatee in the particular mentioned. It must accordingly be held that upon the execution and delivery of the assignment the son became the absolute owner of an undivided two-ninths interest in the principal of this $50,000 trust fund.

[3] The remaining question relates to the effect of the contract of November 25, 1908. Does that contract provide for the transfer of the two-ninths interest in the trust fund to the Higgins Company? It is apparent from the recitals in this agreement that both Kate C. and Orrin T. Higgins were desirous of preventing the conversion of the property constituting the residuary estate into money. They express a wish that the executors should not exercise their power of sale over the real estate, nor their authority for the disposition of the personal securities, but that they should transfer the same to the holding corporation—the Higgins Company. The object of the formation of the corporation was to create a method of preserving and holding intact the valuable properties and securities constituting the residuary estate. All these considerations applied to the securities constituting the trust fund, as well as to the other portions of the residue. The agreement, by its terms, makes no distinction between the trust fund and that portion of the residuary estate which had then actually come into the possession of the residuary legatee. It must be held that this agreement, providing, as it does, that "it is mutually covenanted and agreed between the parties hereto that all the property and estate, both real and personal, which shall belong to and become a part of the residuary estate," should be assigned to the Higgins Company, does in fact provide for a transfer of Orrin T. Higgins' two-ninths interest in this $50,000, fund, and that such agreement had been fully consummated in every detail prior to the death of Orrin T., except the formal transfer of the funds constituting the trust estate as soon as the same were released from the operations of such trust.

[4] When we consider the fact that this two-ninths interest in the large residuary estate approximating in value nearly $1,000,000 was given to the son Orrin T., without any other consideration than that of love and affection, and that he voluntarily became a party to the contract of November 25, 1908, for the sole purpose of conserving and protecting the residuary estate, it can hardly be said now that the position of the executrix of his will in demanding payment of the two-ninths of this residuary estate to her in money is either just, equitable, or conscionable. The proposition is axiomatic that equity will consider that done which ought in good faith to be done. It is not necessary for the executrix of the Orrin T. Higgins will to execute any formal transfer of this two-ninths interest of the trust fund to the Higgins Company. Such transfer was effected by the contract of 1908. All that remained to be done after the death of Orrin T. in order to effect a complete performance of that contract in every de-

tail was the turning over to the corporation of such securities as constituted the trust fund. By the provisions of that contract Orrin T. had parted with and surrendered his rights to the possession of any portion of the securities constituting the trust fund and agreed to accept stock of the Higgins corporation equivalent to and in lieu of his two-ninths interest in the same. Such stock is all that he could have demanded or recovered at any time after the execution of such agreement, and his personal representative is not entitled upon this accounting to recover anything more.

[5] It is, however, vigorously asserted on behalf of the executrix of the Orrin T. Higgins will that the Higgins Company was not a party to the agreement of November 25, 1908; that no privity exists, in consequence of such agreement, between the corporation and Kate C. or Orrin T. Higgins or his legal representative, and that the corporation has no standing in this proceeding to enforce performance of this agreement, and in this connection numerous authorities are cited, especially Embler v. Hartford Steam Boiler Ins. Co., etc., 158 N. Y. 431, 53 N. E. 212, 44 L. R. A. 512, where it is said:

"Under the rules of the common law, giving a right of action upon the engagement or promise of a party, the cause of action is vested in the person with whom, or to whom, the engagement, or the promise, is made. An exception is allowed in the case of a third party, for whose benefit a contract is made, when he may be allowed to bring an action in his own name. In such a case, however, it must appear that, when the contract was made, some obligation, or duty, was owing from the promisee in the contract to the party to be benefited. It is not sufficient that the performance of the contract may benefit a third person. It must have been entered into for his benefit and the promisee must have a legal interest that it be performed in favor of the third person."

Also Rosseau v. Rouss, 180 N. Y. 116, 72 N. E. 916, where it is said:

"Unless she [the plaintiff] had an interest in the performance of the contract there was no consideration therefor, as a promise for the benefit of a third person must not only be supported by a sufficient consideration, but the one furnishing it must have a legal interest in the performance of the promise."

In each of these cases, as well as in the other cases cited, the action was brought by the third party to enforce for his own benefit the provisions of a contract to which he had never become a party; but these authorities have no application to the present controversy. The Higgins Company is not an active litigant in this proceeding. No necessity existed for citing it upon this accounting. Its attitude is simply that of a recipient of such sums as may be turned over to it pursuant to the contract of November 25, 1908. The actual controversy is between Kate C. Higgins and the representative of the Orrin T. Higgins estate.

The purposes for the organization of the Higgins Company have already been referred to. They are set forth specifically in the agreement of November 25, 1908. It was organized merely as a holding company, for the purpose of managing and conserving the residuary estate, of which Kate C. owned seven-ninths and Orrin T. the other two-ninths. They were the only persons interested and the owners of

the capital stock. No other interests have intervened, and no stock of the corporation has been issued to any other parties, aside from nominal amounts in order to properly qualify the requisite number of directors of the corporation. The corporation has no assets other than the property constituting the residuary estate. The entire transactions had between the executors, Kate C. and Orrin T. Higgins after the making of the agreement of 1908 relating to the residuary estate were so had for the purpose of consummating such agreement in every particular.

The corporation was perfected November 11, 1908, and on December 1st of the same year the executors transferred to Kate C. and Orrin T. property of the value of $429,666. Kate C. and Orrin T. immediately thereupon transferred the same property to the corporation. In order to make the stock fully paid for in cash the corporation issued and delivered to Kate C. its check for $334,180 and likewise its check to Orrin T. for $95,480. Thereupon Kate C. and Orrin T. immediately executed and delivered to the company their respective personal checks for like amounts and received in exchange therefor, Kate C. Higgins 2,156 shares, and Orrin T. Higgins 616 shares. Thereupon Kate C. transferred one share of her stock to each Allen B. Williams, Frank L. Bartlett, and N. V. V. Franchot, for the purpose of qualifying them to act as directors. On the 11th day of January, 1909, the executors transferred to Kate C. and Orrin T. other property of the aggregate value of $188,325, and on the same day Kate C. and Orrin T. transferred the same identical property to the Higgins Company. The company thereupon issued and delivered to Kate C. its check for $146,475 and to Orrin T. its check for $41,850. They each in turn, on the same day, drew their respective personal checks to the company for like amounts, and thereupon 945 shares of the capital stock were issued to Kate C. and 270 shares to Orrin T.

On the 22d day of October, 1910, the executors transferred to Kate C. and Orrin T. Higgins 400 shares of the capital stock of the Exchange National Bank of Olean for $84,000, and on the same day Kate C. and Orrin T. transferred this stock to the Higgins Company, and thereupon the corporation issued to Kate C. its check for $65,333.33 and to Orrin T. its check for $18,666.67, and they in turn issued and delivered their checks, respectively, to the corporation for like amounts. The total authorized capital stock of the corporation was $500,000, and $450,000 of such stock was issued to Kate C. and Orrin T. as above stated.

Thereafter the executors transferred directly to the corporation $227,250 worth of other property, for which the corporation paid the executors directly, and the executors have accounted for the same upon their judicial settlement, and it does not appear that any of the capital stock of the corporation was issued to either Kate C. or Orrin T. in consequence of the last-mentioned transfer of assets.

The above facts are referred to for the purpose of explaining the details of the various transactions resorted to by Kate C. and Orrin T. Higgins and by the executors for the purpose of carrying into effect the provisions of the contract of 1908, and it will be seen that $50,-000 of the authorized capital stock of the corporation has not yet been

issued, but is held by the corporation as treasury stock, and in view of the fact that Kate C. and Orrin T. Higgins were the owners of the entire capital stock of the corporation, it is of little consequence just what portion of the capital stock was actually issued to them, as their interest in the unissued or treasury stock is defined by the contract; that is Kate C. seven-ninths and Orrin T. two-ninths. The capital stock issued to them represents the entire assets of the corporation, aside from the nominal amounts issued to the directors, as above stated.

This review of the situation clearly shows that the contract of 1908 was not purely executory in its character; that in effect it did transfer to the Higgins Company the respective interests of Kate C. and Orrin T. in the entire residuary estate. It was fully executed in every detail, except as already stated, to the turning over of the assets constituting the trust fund in question, and the title to such trust fund was in effect transferred to the corporation by that agreement.

It must accordingly be held that both Kate C. and Orrin T. Higgins, by virtue of the provisions of the contract of 1908, had in effect transferred all of their interest in the residuary estate to the corporation, and that the $50,000 remaining in the hands of the trustees and set apart as a trust fund for the benefit of Orrin T. Higgins, such trust having now expired in consequence of his death, should be delivered by the trustees to the Higgins Company.

It appears that a small amount of income had been derived from the trust fund prior to the death of Orrin T. Higgins which had not been paid over to him by the trustees. Such sum, as shown by the account filed herein, should now be paid by the trustees to the executrix of the Orrin T. Higgins will, and the income which has been derived from the investment of said trust fund since the death of Orrin T. Higgins should be paid by the trustees to the Higgins Company.

No objections whatever are filed or made to the trustees' accounts of receipts and disbursements or to their proceedings in any particular. Accordingly, the decree to be made herein will provide that their accounts be judicially settled as filed.

Decreed accordingly.