Arnold L. Fein, J.
Plaintiff Nat Tepper (Nat) now deceased and defendant Samuel Tannenbaum (Samuel) also now deceased and their families were longtime friends. Sometime in late 1961 or early 1962, Nat’s son and present executor Daniel Tepper (Daniel), a member of the New York Bar, obtained employment with Webb & Knapp, Inc., a public real estate corporation, at the instance of Daniel’s then wife, Brigitte, who for many years had a close relationship with William Zeckendorf the then principal of Webb & Knapp, Inc. Defendant Samuel, together with his brother Harry Tañe (Tañe) and Abraham Rosenblatt (Rosenblatt) were the principals of Gotham Building Maintenance Corp. (Gotham) engaged in the business of providing building services to commercial buildings, including daily cleaning of the buildings, window cleaning, polishing and related services both to the owners and tenants of such buildings. Some 20 years earlier, Nat and Samuel had been engaged together in a similar business.
On the trial plaintiff sought to prove that: (1) in late 1961 or early 1962 Samuel sought the assistance of the Teppers in obtaining contracts to furnish such services to buildings owned or operated by Webb & Knapp, Inc., and to their tenants; and (2) at a meeting attended by Nat, Daniel, Samuel *831 and Tañe, it was agreed that, if through the assistance of the Teppers such contracts were obtained, 50% of the profits would be paid to the Teppers. Although the complaint alleges the agreement was that 25% would be paid to Nat and 25% to Daniel, some of the proof preferred by plaintiff on the trial was to the effect that the entire 50% was to be paid to Nat.
Sometime in 1962, an agreement was made between Webb & Knapp and defendant Graybar Building Maintenance Corp. (Graybar) for the rendition of such services by Graybar to the Graybar Building, 420 Lexington Avenue, New York, New York. Sometime in 1963 similar agreements, covering premises 135, 141 and 165 Broadway, New York, New York, were made between Webb & Knapp, Inc., and defendant Exchange Building Maintenance Corp. (Exchange).
Plaintiff claims such contracts were obtained through the efforts of Daniel and Nat and that defendants have breached their agreement to compensate the Teppers for their services. This action is brought to recover Nat’s alleged share of the profits earned under such contracts and related relief including an accounting and a direction to issue Nat’s estate his proportionate shares of stock of the respective corporations.
The evidence is clear that Samuel, Tañe and Rosenblatt were the officers, directors and owners of the stock of Gotham and Exchange. They were also the officers and directors of Graybar. Although the stock of Graybar was never issued, it appears from the corporate books prepared by Daniel and cocounsel that Samuel, Tañe and Rosenblatt were allocated at least 102 shares, that Daniel was allocated 48 shares and Brigitte 50 shares. There is no showing that Nat owned, or was to receive or to be issued any of the stock of Gotham, Graybar or Exchange. Upon the trial, plaintiff sought to establish that, with respect to each of the building service contracts, Nat was either a partner or coventurer with Samuel or a partner or coventurer with Samuel and each or all of the defendant corporations.
There is no evidence upon the basis of which any claim can be sustained on behalf of Nat against Gotham. There is no proof that Gotham entered into any contract with Webb & Knapp or any other corporation to render services of any kind at premises 420 Lexington Avenue, 135, 141 or 165 Broadway, or that Gotham made any profit therefrom. Although the original proposal respecting 420 Lexington Avenue was on the letterhead of Gotham, it is clear that with respect to 420
*832 Lexington Avenue, the agreement for the rendition of services was between Graybar and Webb & Knapp, Inc., and that with respect to 135, 141 and 165 Broadway the agreements were between Exchange and Webb & Knapp, Inc. Subsequently, after Webb & Knapp sold or transferred 135, 141 and 165 Broadway, Exchange continued to render such services to those three buildings while they were owned or operated by Galbreath-Ruffin, Inc. Accordingly, the complaint against Gotham must be dismissed.
There remains for decision whether plaintiff has established that Nat was entitled to a share amounting to 25% or 50% of the profits earned under such contracts covering the four buildings, either as a partner or coventurer with Samuel individually, or with Samuel, Graybar and Exchange, or with said corporations and whether he is entitled to 25% or 50% of the stock of the said corporations.
In support of such claims, Daniel testified in substance to conversations among Nat, Daniel, Samuel and Tane, in late 1961 or early 1962 in which Samuel agreed to pay such 50% share to the Teppers with respect to 420 Lexington Avenue, and to similar conversations in 1963 with respect to 135, 141 and 165 Broadway. All of such testimony was received over objection by counsel for the defendants upon the ground that reception of such evidence would violate CPLR 4519, the Dead Man’s Statute. In further support of such claims plaintiff offered and there was received in evidence over similar objection what purported to be a tape recording of a conversation between Daniel and Samuel sometime in late 1962. Other evidence by way of Daniel’s testimony as to conversations with Samuel and Tane, communications from Tane, now deceased and not a party to this action, checks and other documents and records were offered by plaintiff and received over similar objection.
The case turns on whether the testimony of Daniel as to the discussions with Samuel and Tane and the tape recording of the conversation between Daniel and Samuel were properly received in evidence. If the testimony as to such conversations and the tape recording are excluded the remaining evidence in the case is insufficient to establish plaintiff’s claim.
The defense is that: (1) such evidence was inadmissible; (2) even if admissible, the credible evidence establishes that there was never an agreement for division of profits between Nat and Samuel and Samuel’s corporations; and (3) to the extent *833 that the Teppers had anything to do with the making of the contracts between Gotham and Exchange and Webb & Knapp, Inc., the source of such contracts was Brigitte Tepper, not Daniel and not Nat and that no rights accrued to Nat by reason of or through such efforts of Brigitte.
If Daniel’s testimony and the tape recording are excluded the evidence is as consistent with the defendants’ version as it is with that of the plaintiff.
Despite the court’s doubts as to admissibility, the bulk of plaintiff’s evidence was received over the CPLR 4519 objection in order to make a record for a possible appeal and other purposes, a procedure made available because the case was tried without a jury. (See Matter of Cohen, 137 NYS2d 300, 306, affd sub nom. Edelman v Frindel, 285 App Div 1119, affd 309 NY 935.)
In determining whether the testimony of Daniel was admissible in the face of the objections under CPLR 4519, it is useful to track the statute. (Richardson, Evidence [10th ed], § 397 et seq.; Matter of Cohen, supra; Matter of Christie, 167 Misc 484.) Was Daniel incompetent to testify as "a party or person interested in the event”. It is palpable that Daniel is a party interested in the event because he would gain by the direct legal operation and effect of the judgment, and the record would be legal evidence for or against him in other actions. (Matter of Christie, supra; Hobart v Hobart, 62 NY 80; Wallace v Straus, 113 NY 238.) Although the action is brought on behalf of his now deceased father Nat, and Daniel is suing as the executor of Nat’s estate, the substance of Daniel’s testimony was that he and his father would share 50% of the profits. This was testimony in Daniel’s interest. A third-party beneficiary is incompetent to testify as "a party interested in the event”. (Croker v New York Trust Co., 245 NY 17.) Moreover, it is undisputed that Daniel has brought other actions on his own behalf against these defendants, now pending, premised upon the same contentions and theory. A judgment in this action in favor of his father premised upon Daniel’s testimony would be legal evidence for him against these defendants. (Israel v Wood Dolson Co., 1 NY2d 116; Schwartz v Public Administrator of County of Bronx, 24 NY2d 65.) Palpably he is a person interested in the event within the meaning of the statute, with respect to any claim against Samuel’s estate.
Daniel’s testimony about the conversations was testimony *834 "in his own behalf or interest”. (Rosseau v Rouss, 180 NY 116; Matter of Smith, 153 NY 124.) It was given against "the executor * * * of a deceased person”. The testimony was offered against Samuel’s executor for the purpose of establishing that Nat and Daniel were partners with Samuel and entitled to a portion of the profits. Whether Nat’s share was to be 50% or 25% is immaterial in this context. The object of the testimony was to obtain from Samuel’s estate that portion of the profits and stock to which Nat and Daniel are claimed to be entitled. The judgment sought on the basis of the testimony is to take away from Samuel’s executors a portion of the profits and the stock of the corporations held by Samuel’s executors, as part of his estate. This is what the statute is designed to preclude. (Matter of Christie, supra; Matter of Cohen, supra; Abbott v Doughan, 204 NY 223; Matter of Smith, supra; Matter of Atkinson, 192 App Div 426.)
Plaintiff is asserting a claim adverse to the executors of Samuel’s estate. Daniel is seeking to support the claim by testimony as to his personal transactions and communications with the now deceased Samuel. The statute interdicts testimony "concerning a personal transaction or communication between the witness and the deceased person”. (Holcomb v Holcomb, 95 NY 316; Griswold v Hart, 205 NY 384; Matter of Cohen, supra.) Daniel’s testimony concerned his personal transactions and communications with the deceased Samuel. Accordingly, to the extent that Daniel’s testimony was offered to establish a partnership or coventure with Samuel it was inadmissible and is stricken.
Plaintiff seeks to avoid the mandate of the statute upon the ground that Samuel was an agent for the corporations to be formed, and that testimony concerning conversations or transactions or communications with a deceased agent does not fall within the prohibition of the statute. The law is settled that an interested party may testify as to conversations, communications or transactions with an agent even if either or both agent and principal be dead at the time of trial. (Rodenhouse v American Cas. Co. of Pa., 20 AD2d 620; Warth v Kastriner, 114 App Div 766; McCarthy v Stanley, 151 App Div 358.) However, the rule does not permit such testimony where the deceased agent himself is alleged to have been a partner or coventurer with the principal. The principal in such case is a "survivor of a deceased person” against whom such testimony by an interested person is prohibited (CPLR 4519; Clift v *835 Moses, 112 NY 426; Corning v Walker, 100 NY 547; Melkon v Kirk & Co., 220 App Div 180). Here, if the testimony is offered on the theory that Nat was a partner or coventurer with Samuel and either or both corporations, although the corporations were not yet formed, the statute and cited cases require exclusion of such testimony against the corporations as survivors of the partnership or coventure.
The same principle applies if Samuel and the corporations are being sued jointly for breach of contract. The judgment is sought against both Samuel’s executors and the corporations and depends upon the alleged breach by Samuel whose estate would be liable for contribution. (See Melkon v Kirk & Co., supra).
To the extent that Daniel’s testimony was offered against the corporations only, on the theory that Nat was entitled to share in their profits either as a partner, coventurer or as a stockholder, it was also inadmissible under the statute. (Matter of Cohen, supra.) As that case holds, such testimony was inadmissible because in effect it was given against the executors of a deceased person. The object of this suit is to take something away from Samuel’s executors, either his pro tanto share of the profits or his stock of the corporations. As stated in Matter of Cohen (supra, p 307): "The sole object of the suit is to take something away from the executors — either the real property itself or stock of the corporation which owns the real property. Plaintiff is asserting a claim adverse to the estate which the executors represent and he is seeking to support it by his own evidence as to personal transactions with the deceased, and that is exactly what the statute prohibits. Matter of Atkinson, 192 App. Div. 426, 429, 182 N.Y.S. 780, 781, 782.”
On the face of the record, if Nat’s claim is not upheld, Samuel’s executors own 45% of the stock of each of the corporations and his estate would be entitled at least to that share of the profits of each. If Nat’s claim is upheld, the interest of Samuel’s executors in each corporation will be diminished pro tanto. Matter of Cohen (supra, p 308) teaches that this is the very result which the statute is designed to prevent:
"Furthermore, even if plaintiff’s so-called first cause of action were in fact a cause of action different from his so-called second cause of action, and even if that first cause of action were one which plaintiff properly could elect to assert *836 against 111-115 Broadway Company, Inc. alone, plaintiffs testimony in support of that cause of action still would be testimony against the executors because the executors are the holders of the stock of 111-115 Broadway Company, Inc. and in taking something away from 111-115 Broadway Company, Inc. plaintiff is taking something away from the executors, even though they are not, in form, parties to that cause of action.
" 'The purpose of the statute is to protect the estate of a deceased person and all those succeeding to the property and interest of the deceased.’ Richardson on Evidence, 5 Ed. Sec. 466, p. 374, and that purpose certainly would be defeated if the bar of the statute could be avoided by the device of framing a pleading in such a way that in form the claim is asserted only against a corporation the stock of which is owned by the decedent’s executors.”
The rationale of the statute, as elucidated by Matter of Cohen (supra), requires the exclusion of such testimony because it would affect property derived from or through a deceased corporate agent. (See International Packaging Corp. v Marshall, 68 Misc 2d 575, 577.) Accordingly, all of the testimony of Daniel as to conversations, communications and transactions with Samuel, received over objection pursuant to CPLR 4519 must be stricken and disregarded as against Samuel’s executors and the corporations.
The next question relates to the admissibility of the tape recording made by Daniel of his alleged conversation with Samuel. The law is well settled that a tape recording is admissible when a proper foundation has been laid and other conditions of admissibility are met. No cases have been cited or found which make a tape recording admissible, in the face of an objection under CPLR 4519, when the person making the recording and participating in the conversation or overhearing it is himself incompetent to testify as to the conversation by reason of the statute. (See Moyer v Briggs, 47 AD2d 64.) The foundation for the introduction of the tape in evidence was primarily the testimony of Daniel. It is he who made the tape and participated in the conversation relied upon. Accordingly, as required, the foundation was sought to be laid by Daniel. He testified over objection as to the date, time and place, identified the voices and gave the context in which the conversation occurred. Such testimony must be stricken.
*837 The rule is now well settled which excludes the testimony of an interested witness to any knowledge which he has gained by the use of his senses from the personal presence of the deceased. (Griswold v Hart, 205 NY 384, 395.)
The Griswold court further stated (p 397): "Anything imparted by one to another is communicated by him, even disease. A personal communication, within the meaning of the section, was well defined by the Supreme Court in Price v. Price (33 Hun. 69, 73), as 'any one which the surviving party claims to have received directly or indirectly from the deceased person, and which the deceased person if living could contradict or explain. Nor, in our judgment, is the mode of making the communication by the deceased to the survivor at all controlling.’ ”
The court also quoted with approval from Clift v Moses (112 NY 426, 435, supra), where the court stated: "It has been held with general uniformity that the section prohibits not only direct testimony of the survivor that a personal transaction did or did not take place, and what did or did not occur between the parties, but also every attempt by indirection to prove the same thing”.
In Griswold, it was held that a husband who overheard a conversation between his wife and another was not a competent witness, in his own interest, as to the conversation, his wife and the other both being deceased at the time of trial. Significant for our case is the court’s comment that an eavesdropper’s testimony would be incompetent. (205 NY 394, 395, supra.)
To the same effect are Van Vechten v Van Vechten (20 NYS 140) and Holcomb v Holcomb (95 NY 316, 325) where the court stated that the prohibitions of the statute cover "every variety of affairs which can form the subject of negotiation, interviews, or actions between two persons, and include every method by which one person can derive impressions or information from the conduct, condition or language of another.”
A tape recording manifestly falls within this interdiction. A tape recording made by one who is incompetent to testify under the statute which purports to record a conversation between the recorder and a deceased person against whose estate the recording is offered is not admissible on the basis of a foundation sought to be laid by the recorder. It is open to all the abuses the statute is designed to prevent. As stated in Van Vechten (supra, p 142): "If the deceased could contradict, *838 explain, or qúalify the testimony, if living, it comes within the rule”.
Nor is the inhibition overcome by the testimony of the several persons who purported to identify the voice of Samuel on the tape. Although some of the testimony was of doubtful credibility, it is assumed for purposes of this decision that such persons properly identified the voice of Samuel. Nonetheless, the tape purports to record a conversation between Daniel and Samuel and is offered by Daniel in his own interest. If Daniel is incompetent to testify, the taped conversation is equally incompetent. Moreover, the court listened to the recording several times with and without the purported transcript prepared by Daniel and his attorney. Although all of it was not audible and intelligible, it was manifest that the statements ascribed to Samuel would have no significance without the questions and statements ascribed to Daniel. Accordingly, the motion to strike the tape recording must be granted.
As has been noted, if the testimony of Daniel and the tape recording are excluded from evidence, the remaining evidence offered on behalf of the plaintiff is insufficient. However, it is appropriate to consider three other items of evidence over defendants’ objection pursuant to CPLR 4519. Plaintiff read in evidence a substantial portion of the examination before trial of Samuel taken while the action was pending. As the court ruled at the time, the objection under CPLR 4519 was not well taken. The examination before trial of a deceased party may be read in evidence against the estate of such party. (Foro v Doetsch, 39 AD2d 150, 158.) However, such testimony offered against the estate does not constitute testimony of the deceased person given in evidence within the meaning of the waiver provisions of CPLR 4519. In short, as Foro holds, it may not be used as a bootstrap for the admission against the estate of testimony by others, prohibited by CPLR 4519. Nor did the subsequent reading of portions of the deposition on behalf of the defendants in order to clarify the portion read on behalf of the plaintiff constitute a waiver. The court adheres to the ruling made on the trial that the deposition was admissible. However, the deposition testimony is insufficient to sustain the plaintiff’s claim.
Equally insufficient are the communications over the signature of Tane. Despite plaintiff’s great reliance on plaintiff’s Exhibit 40, Tane’s letter to Daniel, entitled "Gotham-Graybar *839 Recap” it does not sustain any claim on behalf of Nat either in and of itself or when taken together with the depositions of Tane and Samuel and the other admissible evidence, assuming all of it is found credible.
Nor do the minute and stock books of Graybar and Exchange support the plaintiffs claims. Independent of the alleged conversations between Daniel and Samuel, the fact that a Graybar stock certificate was prepared in the name of Daniel but never issued for 48 shares of the stock of Graybar does not establish that Nat had any interest in the corporation or its profits. It is notable that these books and records were in Daniel’s possession when the certificates were prepared and other entries made. Nor does the entry in the Graybar cash receipts book, plaintiffs Exhibit 38, showing $98 received from Daniel demonstrate Nat’s alleged interest.
Equally insufficient to establish Nat’s claim are the checks issued to Nat’s wife, Selma Sisselman, and to Daniel and Brigitte. Although they undoubtedly establish that payments on some basis were being made to Selma, perhaps for Nat’s benefit, and some to Daniel and to Brigitte, they do not independently establish any interest of Nat in the profits of the corporations or in the stock thereof. Taken together with the depositions of Samuel and Tane and the communications from Tane to Daniel, the checks are as consistent with some arrangement made by Brigitte as they are with plaintiffs claim that they were a means to pay Nat a portion of the profits pursuant to an agreement with him and Daniel entitling Nat and Daniel to such shares and to a portion of the stock.
The objections of the defendants to the testimony of Daniel concerning his conversations and those of his father with Samuel and to the introduction of the tape recording are now sustained and such testimony is stricken as against all defendants.
Defendants are entitled to judgment dismissing the complaint.