JENNIE SMITH, Respondent, v. ANNITA M. BURHYTE and GEORGE D. ALDERMAN, Administrators, etc., of WILLIAM L. PALMER, Deceased, Appellants.

Third Department, July 7, 1921.

Executors and administrators — action by married woman to recover for services rendered to decedent — evidence not showing that decedent contracted for services — plaintiff not carrying on separate business under Domestic Relations Law, § 51 — husband of claimant not competent witness — rule as to sufficiency of evidence stated.

In an action against an administrator to recover for services and personal care of the decedent during a period of about five years, it appeared that the decedent was a man of about eighty years of age, without relatives, that the plaintiff and her husband resided on his farm in a house separate and apart from the decedent and that she performed many neighborly acts of kindness for the decedent and furnished him with food from time to time, but that as to the food and services rendered the decedent gave the plaintiff's husband credit.   Held, on all the evidence, that the judgment for $1,100 was grossly excessive;

That the husband of the plaintiff was incompetent to give a lump sum value of the plaintiff's services, or if competent, that the evidence shows that his testimony upon that subject was substantially worthless, and that the services were grossly exaggerated.

*Prima facie,* if any obligation was incurred by the decedent, it was to the husband of the plaintiff who was a tenant on decedent's land and not to the wife, and said arrangement did not furnish an independent basis for a recovery by the wife, who was not carrying on any separate business or occupation within the meaning of section 51 of the Domestic Relations Law.

Plaintiff's husband was incompetent to give testimony as to transactions with the decedent.

In cases of this character liability should be made out by clear and convincing testimony and the trier of fact has the right to insist that the justice and reasonableness of the claim shall be established by the most satisfactory evidence; the testimony in this case does not come up to the requirements which should control the conscience of the court in determining whether the evidence warrants a recovery.

COCHRANE and KILEY, JJ., dissent.

APPEAL by the defendants, Annita M. Burhyte and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Madison on the 25th day of May, 1920, on the verdict of a jury, and also from an order entered in said clerk's office on the 1st day of June, 1920, denying defendants' motion to set aside the verdict and for a new trial made upon the minutes.

*Carlos J. Coleman* [*Clarence R. Runals* and *Paul P. Cohen* with him on the brief], for the appellants.

*William L. Burke,* for the respondent.

JOHN M. KELLOGG, P. J.:

The plaintiff has recovered a judgment for $1,100 for her services and personal care of the decedent from March 11, 1914, to October 6, 1919, the day of his death. At the time of his death he was about eighty years of age, unmarried, and had no relatives nearer than a niece. A sister, who had resided about ten miles from him, died March 10, 1914. It does not appear that she was ever a member of his household or rendered him any assistance. He had a little farm, leased to plaintiff's husband, and a house and about two acres of land where he lived. He lived alone and worked the two acres and a half of land, with some assistance from others, raising some potatoes, a little corn and apparently some hay. He died at the barn while he was husking corn. He was around attending to his duties, and in apparently good health

for a man of his age.  The plaintiff's husband said that he occasionally had a " give out spell," but for the last year had been better than before, and no " give out spell " is mentioned during that time.  He was a miser, and left no debts at the time of his death unless he owed the plaintiff, her husband and her son, each of whom has brought an action against the estate.  He was quite a methodical man, kept a diary of all current events and a book of accounts with any one with whom he dealt.  There is at least a question if the plaintiff did not, after his death, obtain the account books and keep them.  Plaintiff asked permission to keep the diaries, which she had taken possession of, as a memento, and assent was given without examination.  She claims that but one book was taken; other evidence indicates there were several.  The house was very small; she describes it as follows: " The walls had not been papered in a long time; in fact they were dirty.  *  *  *  Mr. Palmer had grown old and he was careless in his habits and he was indifferent to the surroundings of his home and his bedroom had never been papered.  I do not know whether it ever had been whitewashed or not. *  *  *  The sheet he had on his bed at the time he died was the covering to an old mattress Mr. Munson's folks had thrown away and tried to burn up.  He had rescued the mattress from the flames and had taken it home, and had taken the stuffing out of the mattress.  He had washed, in the creek, the covering and put it on his bed.  During his last sickness I tried to get him to put on some clean sheets." He kept a cat, and a box full of sawdust was in the house for the use of the cat and in which he expectorated.  He never had a doctor.  He cooked his own meals, did his own work except as far as plaintiff claims to have assisted him and as other benevolent neighbors sent in provisions for him.

The plaintiff relied upon her husband as the chief witness to prove her case.  He was not a fair witness, but sought every opportunity to crowd into the case something which the court had excluded.  The court remonstrated with him from time to time and told him he was hurting his wife's case, but finally announced that he would let the witness take his own course, which the witness did.  The husband claims that prior to the sister's death they had been good neighbors to

the decedent, had sent him provisions, and that his wife and he had assisted him in various ways, but without any expecta tion of compensation; they were simply acts of good neighbor- ship. He says that after the sister's death plaintiff carried in his breakfast that morning; that he was crying and talking about his sister and that he said: " Eva is gone now, I am all alone, you will have to look after me." ' This was at least a queer remark, as the sister had not lived with him or assisted him and he was in his usual health. The plaintiff's entire claim rests, in substance, upon that alleged conver- sation. Plaintiff and her husband claim it was a hiring of both of them to take care of him and furnish him things. There is no evidence of any change thereafter in his dress, manner of living or the dirty, filthy condition of his house and surroundings. At times he slept on a bunk in the barn. The husband was asked why he did not present his bill to the living man; he answered, " we were to have the pay when he was ready to give it to us; he promised us — [counsel interrupted]. Q. I did not ask you what he promised you. I asked you why you did not present the bill?" The witness did not answer the question. The plaintiff all the while was a married woman, living with her husband, the chief witness, and her son. They lived on a farm, their house being about forty rods from the decedent's house. There were some other neighbors within about an equal distance. The alleged services were of a most trivial nature, when we understand the manner in which the man lived. The principal claim is that frequently the wife carried down to his house a chicken dinner, or some bread, or things which she had cooked at her house, and sometimes carried him things which she cooked at his place. She also carried him milk which the husband sold to him; that she wrote letters for him, although only one person is mentioned to whom a letter was written, and one letter at that; that she drove him to the mill to get a grist ground; that his mail came in their mail box, and the wife or some other member of the family carried it down. Presumably the old miser did not have a very heavy mail. At one time he went to a store kept by a relative of the plaintiff, and in which she at times clerked, and he asked her judgment about a mackintosh and she helped him select one;

that she bought swamp root for him at the store of the relative, and pills and other things, and that she did mending for him. The husband is only able to swear about darning a sweater and sewing an outside pocket on the mackintosh; a neighbor swears that his wife sewed on this pocket. The husband conceded that the old man did a great part of his own mending and that the wife did not do as much for the last year or two. Perhaps this evidence is explained by the fact that the wardrobe was in court, and the husband was asked to examine the stockings and garments and point out anything the wife mended, but was unable to do so, and when a mended sock or article was found he said it was mended by the deceased himself. For sometime prior to his death it is very clear that he did his own mending and darning. The mother of the plaintiff was at her house for a time, and said that she went down during that time with plaintiff to the decedent's house; that she went down because the plaintiff was afraid she would find the old man dead; that she would go to the door, the plaintiff would go in and she would wait until the plaintiff came out and then they would go home. It is said she built the fires for him; the mother swears to plaintiff's building a fire once. There is no doubt but the plaintiff and his wife were kind to the old man, but it is improbable that this old man ever agreed to or expected to pay them, or that they ever expected he would. The services were just the little ordinary services that kind-hearted neighbors would do for an old man. The husband says the decedent had a good broom, but to save it he would always use the old broom, which was of but little value, and that his wife swept for him and made his bed for him at times, and helped him put on his coat and button it when it was cold and his fingers were stiff, and states an occasion of this kind. At another time he says the old man came from the hill, where he had been at work and was caught in a storm, and that she helped to take off his rubber boots and put on some dry stockings. It is unreasonable to suppose that she assisted him to bed, or that she helped dress him, or did any particular amount of sweeping for him. There was no reason why she should; he was well and was running his little place in his own way. She wanted to paper the house but he would not consent.

She brought samples of paper, such as she was using at her house, but he put it off until spring and never papered. As we have seen, the husband kept crowding into the case evidence which was not responsive, and which it was hard to keep out; but in fact his evidence is only material so far as he swears to specific things which he saw done, and when examined as to the particular things the evidence is wanting. The most substantial part of the evidence in favor of the plaintiff is that the mailman at times saw her carrying provisions or other things from her house to his house. During a great part, if not all the time, the husband was working the old man's farm, as he claims, under an agreement that he was to pay the taxes for the use. This does not seem reasonable or probable. One of the diaries or books was found and produced in court. The husband swears that the old man was honest and he never knew of his doing a wrong. The husband and wife recognized the entries as in the old man's handwriting. Among other things, he credits the husband with one dollar for a chicken; this probably accounts for one of the chicken dinners, and with mending, ten cents, probably the darning of the sweater sworn to by the husband; with milk from time to time, and other items, showing clearly that the old man understood that whatever was being done for him was being done by the husband, his tenant, and entered into their accounts. The husband swears that the services of his wife to the deceased were worth ten dollars a week. His attention is called to each item which he swore to, and he is unable to give the value of that service, but he claims the wife took care of the old man and it was worth so much to take care of him, and he had heard it said that a certain man for taking care of a certain person got so much a week, and he mentions two or three instances. It seems incredible that he could give the value of the services by the week. His estimate was upon the theory that the wife had the personal charge of the old gentleman and entirely took care of him, of which there is no substantial evidence.

Upon the merits, if the husband were a competent witness, we arrive at the result (1) that the judgment is grossly excessive; (2) that the husband was incompetent to give a lump-sum value of the plaintiff's services, or if competent, that

the evidence shows that his testimony upon that subject is substantially worthless, and that the services are grossly exaggerated. It does not appear that the house was any better kept, the old man any better cared for, or that he lived in any different way after the death of his sister than he did before, and the claim for compensation for his last sickness is purely fictitious, when we remember the husband swears he was in better health the last year and that he died at the barn while husking corn. The exaggeration of the whole case is fairly illustrated by the claim that she assisted him in husking corn. There was about a quarter of an acre of corn, and nobody knows how much she did towards the husking except for the last year one of the neighbors swears that after the old man's death he husked out the corn and that there was nothing to indicate that any other corn had been husked except the part the old man was husking at the time of his death.

It being conceded that the services prior to the sister's death were gratuitous, it was necessary for the plaintiff to prove a contract, or the basis of a contract, in order to recover. The death of the sister was not an important event as affecting his manner of living, for as we have seen she did not enter into his domestic arrangements. It is seized upon to indicate a change in his method of living and as the basis for the alleged agreement. It is entirely an artificial basis. The alleged statement to the husband and wife, " I am all alone, you will have to look after me," to neighbors who had always gratuitously helped him, is not a hiring or an agreement to pay. If it were, it is not an agreement to pay the wife, but an agreement with the head of the family. The provisions used by the deceased at the plaintiff's house, the provisions carried by her to the house to him, were concededly the husband's provisions and cooked by his wife as a part of her duties in the household. The milk and provisions which were carried were concededly sold by the husband, the owner, and either paid for to him or is in his account which he is making against the estate. The plaintiff all the while was caring for her little family, her husband and son and herself, and was assisting in running their farm. Throughout the husband's evidence he speaks of it as " we are to have

pay," "we are charging;" showing while he has attempted to qualify himself as a witness by showing that the wife did the work; that she is not charging for the provisions, but for carrying them; that he is an interested party; he speaks of it as "their claim" and "their agreement," and that "they were to be paid." *Prima facie*, if any obligation was incurred by the deceased, it was to the husband and not to the wife, and the meager quotations from the books of the decedent show that that was the understanding.

Objection was made that the husband was incompetent to give testimony as to a transaction with the deceased. I think that objection should have been sustained and that a great part of the evidence was erroneously received. The agreement of employment, if made, was the husband's agreement, and for his benefit. The wife was not carrying on any separate business or occupation under section 51 of the Domestic Relations Law, but was a party to the conversation or agreement only as wife. (*Hopkins* v. *Clark*, 90 Hun, 4; *Birkbeck* v. *Ackroyd*, 74 N. Y. 356; *Johnson* v. *Tait*, 97 Misc. Rep. 48; *Gorman* v. *N. Y., Chicago & St. Louis R. R. Co.*, 128 App. Div. 414; *Stevens* v. *Cunningham*, 181 N. Y. 454 and cases cited at p. 458; *Holcomb* v. *Harris*, 166 id. 257.) We quote from *Holcomb* v. *Harris* (p. 261): "There is no provision in the act of 1884* affecting the common-law right of a husband to the earnings and services of his wife when not received or rendered expressly upon her sole and separate account. The jury were justified in finding that the wife of the plaintiff rendered these services while living with her husband and under a contract made by the latter with the testator. It follows that this action was properly brought in the name of the present plaintiff."

Under the circumstances, the presumption is strong that the arrangement, if any, was made with the husband as husband, and does not furnish an independent basis for a recovery by the wife. Concededly the husband was a tenant of the farm; he used the barn and had some hay. There was an account with him, and the dealings between him and the

---

* See Laws of 1884, chap. 381. Amd. by Laws of 1892, chap. 594; Dom. Rel. Law (Gen. Laws, chap. 48; Laws of 1896, chap. 272), § 21; Dom. Rel. Law (Consol. Laws, chap. 14; Laws of 1909, chap. 19), § 51.— [Rep.

decedent should embrace all the items. The action of the plaintiff is apparently an evasion to get the benefit of the husband's evidence and to exclude a consideration of his dealings with the deceased. The services of the wife in the household, and in connection with the house and with the husband's business, are *prima facie* on his account. The fact that he was the tenant, and had business dealings and accounts with the decedent, adds materially to the presumption.

As we have seen, the husband, although pressed, could give no satisfactory reason why the account was not presented to the decedent in his lifetime. The case rests under a certain suspicion; liability should be made out by clear and convincing testimony. It is easy to prove a claim where the other party is silenced by death. The trier has the right to insist that the justice and reasonableness of the claim shall be established by the most satisfactory evidence. The rule is well understood, and it is only necessary to refer to a few of the many cases upon that subject. (*Matter of Hart* v. *Tuite*, 75 App. Div. 323; *Walbaum* v. *Heaney*, 104 id. 412; *Rosseau* v. *Rouss*, 180 N. Y. 116, 121; *O'Brien* v. *Foley*, 150 App. Div. 257, 258; *Apthorp* v. *Thurston*, 153 id. 572, 576; *McKeon* v. *Van Slyck*, 223 N. Y. 392.) The case of *Kane* v. *Smith* (109 App. Div. 163) is quite similar to this, and is very instructive. The testimony in this case does not come up to the requirements which should control the conscience of a court in determining whether the evidence warrants a recovery.

The judgment should, therefore, be reversed upon the law and the facts, and as excessive, and a new trial granted, with costs to the appellant to abide the event.

All concur, except COCHRANE and KILEY, JJ., dissenting.

Judgment and order reversed upon the law and facts and new trial granted, with costs to appellant to abide event. The court disapproves of the finding that the plaintiff rendered valuable services at the request of the decedent; that the decedent agreed to pay her for any services rendered; that the value of the services rendered by the plaintiff to the decedent was $1,100.