In the Matter of the Judicial Settlement of the Account of Proceedings of ARMIN TRAZENFELD, as Administrator of CELIA BLOCK, Also Known as CELLE BLOCH, Deceased.

HARRY TRAZENFELD and Others, Appellants; ARMIN TRAZENFELD, Respondent.

First Department, January 4, 1940.

*Jay Leo Rothschild* of counsel [*Louis Rivkin* with him on the brief; *Ellis J. Bisgyer*, attorney for all appellants except Eugene Trazenfeld; *David S. Rosenberg*, attorney for appellant Eugene Trazenfeld], for the appellants.

*Eugene L. Bondy* of counsel [*Bondy & Schloss*, attorneys], for the respondent.

GLENNON, J. The decedent, Celia Block, died on October 15, 1935, at the age of seventy-three. She left surviving thirteen nephews and nieces. Letters of administration were issued to the respondent, Armin Trazenfeld, a nephew, on the 20th day of December, 1935. On September 22, 1937, the administrator filed his account of proceedings in which he charged himself with the sum of $21,565.76 and credited himself with the sum of $7,633.82, leaving a net balance of $13,931.94. In his accounting he stated that the last mentioned sum of money was " to be distributed to those entitled thereto, subject to the deductions of the amount of my commissions, and the expenses of this accounting and the disposition of claims filed against Estate."

He filed a claim for the entire estate in which he stated: " Heretofore and prior to the death of Celia Block, deceased, Celia Block entered into an oral agreement with the administrator wherein and whereby said administrator agreed to furnish her with a home and personal care during the remainder of her life insofar as said Celia Block might request same, and the said Celia Block agreed in consideration thereof that upon her death, the said administrator would receive all of her property of whatever kind or nature that might remain after the payment of her funeral expenses and of her just debts. Said deceased Celia Block further agreed that she would duly execute a last will and testament giving effect to her aforesaid obligation. Upon the death of said Celia Block a careful investigation discovered no will of any kind and said Celia Block died intestate. That the said Armin Trazenfeld performed all of the obligations of the aforesaid agreement on his part to be performed and furnished to the said Celia Block a home and personal care, insofar as she requested same, during the entire period from the date of the making of the said agreement to the date of the death of the said Celia Block." He further added as follows: " And /or in the alternative, the said Armin Trazenfeld hereby makes claim that if the above claim should be found unenforcible for any reason whatever, that he be paid from the assets of the estate of Celia Block, deceased, the sum of $2,600 at the rate of $10 a week for the last five years of her life, as a reasonable compensation as consideration for furnishing her with a home and personal care."

Thus it will be seen that in the event that he could not prove his claim to the entire estate, he sought the sum of $2,600 as compensation for furnishing the deceased " with a home and personal care."

After the account was filed, the twelve remaining nephews and nieces of the deceased filed objections. The matter was referred to a referee " to hear and determine all questions arising upon the settlement of such account * * *, and to make a report thereon." A great deal of testimony was taken and a considerable number of exhibits were received in evidence. The referee upheld the claim of the respondent to the entire estate. The report of the referee was confirmed and a decree settling the administrator's account was entered. An examination of the record has convinced us that the referee, in so far as he upheld the claim of the respondent to the entire estate, erred.

The respondent called his wife, Fannie Trazenfeld, as a witness in support of his claim to the entire estate. She testified in substance that the deceased, in the middle of February, 1930, about ten days after the death of her husband, paid a visit to " our store " on Freeman street in the county of Bronx. She quoted the deceased as saying, " You know, Armin, you was always my favorite nephew and I always managed to come to you before — the holidays I brought you wine — and I always liked you, so I want to ask you if you are willing to give me a home as I can't stop in my apartment and I am too sick to be alone." The witness continued, " Then she turned to me and said also we both willing to give her a home. My husband and myself both said ' Yes, Aunt Celia, we can make you room in our apartment.' She said, ' If you are willing to give me a home for the rest of my life I'll make a will and leave everything to you.' My husband said, ' Very well, Aunt Celia,— he said ' Tanta ' and I said, ' All right, Tanta, we will try to make you very comfortable and happy.' "

She further testified on cross-examination, in referring to the same conversation: " She said to my husband she always liked him; he was her favorite nephew; she loved my children like her own and my husband said to her, ' All right, we will make room and give you a home.' We both said, and then she said, all right she will make a will and leave everything to my husband and his family if we will be willing to give her a home."

While it is contended upon this appeal that the witness was not competent to testify under section 347 of the Civil Practice Act, because of her interest in the estate, no objections on the part of the appellants were interposed to the testimony which she gave. It is quite apparent that the witness had a direct interest in the outcome of the litigation, since the promise on the part of the deceased was

to make a will and " leave everything to my husband and his family if we will be willing to give her a home."

Assuming, however, that the witness was competent under the provisions of section 347, her testimony must be scrutinized carefully, not only because the lips of the other party to the contract are sealed in death, but also by reason of the interest which the witness had in the outcome of the controversy. We do not deem it necessary to quote at length from the evidence of other witnesses who were called for the purpose of testifying as to alleged admissions on the part of the deceased, since the testimony of respondent's chief witness, his wife, as to the alleged agreement is not worthy of belief.

Bearing in mind the fact that Armin Trazenfeld was appointed administrator in December, 1935, it would be advisable to see the position which he took with reference to the estate a little more than three months after letters of administration were issued to him. In a letter under date of March 23, 1936, he wrote to some of the objectants in part as follows: .

" now I suppose you want to know about Tante's estate, well she left 14,500 fourteen thousand five hundred dollars worth of First mortgage bonds but we have to keep them the price is down so we can't sell them now there was also 600 dollars in cash at the time she died but there was funeral expenses so not much was left. and now a few days ago we found in the pocket of an old coat 3 bank books with 13,000 dollars in them, you could imagine the surprise we had, now I told the lawyer who did the work in the case to let everybody in the Family know about it and he should call them all together and settle the whole thing and give everybody a certain part of the estate, of course I expect to get a bigger share because she lived with me 5½ years and paid only a few dollars besides she said many times that whatever she has will be ours I surely thought she is going to make a will but as she just fell asleep, so we couldn't ask her anything. anyhow I don't want to get everything for myself if we could settle in a nice way it would be much better, if not it will not be so easy I think it would be a good Idie if you write to Ressin that you are willing to settle the way she thinks it's right. I will also let you know how thinks will go on.

" have no more to write wishing you all the best of health and love to you all from all."

It must be remembered that the respondent's wife asserted that he was present in February, 1930, at the time the alleged oral agreement was entered into and still, it will be observed, no reference to any contract was made in this letter.

Called as a witness on his own behalf as to certain items in the account, the respondent gave the following testimony: " Q. You said in the meeting that was held in your house, March, 1936, you say when they got together you told them you had some good news for them and did you mean that it was good news for them? A. Yes, I suppose I did. Q. At that time you offered them $300? A. Yes. Q. And when the meeting was called in Hertz' office you offered $500? A. Yes. Q. And all that time you said the estate belonged to you? A. Yes. Q. And if I remember correctly after that you offered about $1,400 is that correct? A. Yes. Q. To each one of them I mean, and all the time you claimed the estate belonged to you? A. That's right."

It is difficult to imagine that the respondent would be willing to pay out to the relatives of the deceased $16,800, if in fact he had a valid contract which would entitle him to the entire estate.

A study of this record leads one to the irresistible conclusion that the claim that a contract was entered into in 1930 was an afterthought calculated to deprive the other relatives of the deceased of their just share of the estate. In order to prevent people from asserting this type of claim, the Legislature in 1933 provided that such an agreement would have to be in writing. (Pers. Prop. Law, § 31, subds. 1 and 7.)

Even before the amendments of 1933, the courts laid down the rule that testimony, such as we have here, should be carefully and critically scrutinized by the triers of fact when offered against a dead person's estate. (*Ward* v. *N. Y. Life Ins. Co.*, 225 N. Y. 314; *Matter of McMillan*, 218 id. 64; *Taylor* v. *Higgs*, 202 id. 65.) In *Taylor* v. *Higgs* (*supra*) Chief Judge CULLEN said, in part: " In *Hamlin* v. *Stevens* (177 N. Y. 39) Judge VANN, speaking for the court and referring to agreements of the character here sought to be enforced, said: ' Contracts of the character in question have become so frequent of recent years as to cause alarm, and the courts have grown conservative as to the nature of the evidence required to establish them, and in enforcing them, when established, by specific performance. Such contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises. * * * Such contracts should be in writing, and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses.' * * * In *Rosseau* v. *Rouss* (180 N. Y. 116) the same judge, again speaking for this court, said: ' Thus, the evidence relied upon to establish the contract is, *first*, the testimony of the mother, who tried to swear $100,000 into the pocket of her own child, and, *second*, the

testimony of witnesses who swear to the admissions of a dead man. The former is dangerous; the latter is weak, and neither should be acted upon without great caution. We have repeatedly held that such a contract must not only be certain and definite and founded upon an adequate consideration, but also that it must be established by the clearest and most convincing evidence.' * * * Tested by these rules it seems to me the plaintiffs did not establish their case."

Furthermore, it should be noted that, in order to bolster up the claim, respondent's wife gave testimony to the effect that the deceased was provided with food, lodging and laundry service without compensation. Again turning to the letter of March 23, 1936, we find the statement on the part of the respondent that " she lived with me 5½ years and paid only a few dollars." This remark would seem to be at variance with the testimony of Mrs. Trazenfeld. In fact, it is contended on the part of the appellants that the deceased paid at least nine dollars a month for her room and that she purchased and prepared her own food. Indeed there is testimony in the record, by at least one tradesman in the neighborhood, that she was accustomed to purchase food for her own account in a store which he conducted in partnership with one of the relatives of the deceased.

We have not overlooked the fact that $879.23 of the money belonging to the estate was deposited in Fannie Trazenfeld's personal bank account. That sum was made up in part of a check which represented the proceeds derived from the sale of a mortgage certificate belonging to the estate. The check was made out to the respondent as administrator, and still he had his young son sign the respondent's name and make the deposit. Why this procedure was followed is left to conjecture.

For all of the reasons assigned, we have reached the conclusion that the decree and the order appealed from should be reversed, the claim of the administrator for the entire estate disallowed, and the proceeding remitted to the Surrogate's Court for completion of the accounting, with costs to the appellants to abide the event.

MARTIN, P. J., DORE, COHN and CALLAHAN, JJ., concur.

Order and decree unanimously reversed, the claim of the administrator for the entire estate disallowed, and proceeding remitted to the Surrogate's Court for further action in accordance with opinion, with costs to the appellants to abide the event.