WILLIAM C. OURSLER et al., Respondents, *v.* APRIL O. ARMSTRONG et al., Individually and as Executors of GRACE OURSLER, Deceased, et al., Appellants.

First Department, June 4, 1959.

*Woodson D. Scott* of counsel (*Edmund P. Rogers, Jr.,* with him on the brief; *Lord, Day & Lord,* attorneys), for appellants.

*Arthur N. Field* of counsel (*Irving Brown* and *Eugene L. Levy* with him on the brief; *H. Donald Sills* and *Karl S. Lowenthal,* attorneys), for respondents.

BERGAN, J.   On March 16, 1951 Fulton Oursler, a noted writer and editor, and his wife Grace executed wills at the same time and before the same attesting witnesses.   In the testamentary dispositions with which we are concerned in this litigation, the wills were identical.

Fulton had been married previously.   He had two children in his first marriage; he had two children in his marriage with Grace.   His will provided that the residuary estate would go to Grace; but if he survived her it would go to the four children of both his marriages, or their children; the will of Grace provided that her residuary should go to Fulton, but if she survived him, the property coming to her from Fulton would go to the same four children of both Fulton's marriages, or to their children.

It is clear that in making these dispositions the husband and wife were dealing with the testamentary flow of Fulton's property; because Grace, who was also an author, made dispositions of her own property only to the two children of her marriage with Fulton.   With these additional dispositions by her will we are not directly concerned.

Fulton died in 1952; Grace survived him.   On January 21, 1955 she made a new will revoking her will of March 16, 1951. In the new will she left everything to her own two children by Fulton and nothing to the children of his first marriage.   She died in December of 1955 and her last will was admitted to probate by the Surrogate of New York County on January 3, 1956.

This action by the children of the first marriage and their children seeks to impress a trust on the property received by Grace under Fulton's will; and the court at Special Term after a trial has granted judgment for the plaintiffs imposing a constructive trust on the property which came to Grace under Fulton's will in accordance with her will executed simultaneously with that of Fulton in 1951; and requires her executors and distributees to act accordingly.   Their appeals search the power of the Special Term to make such a judgment on this record.

It is clear that there is no remedy for plaintiffs to be laid in contract; they are unable to show either an enforcible contract by Grace to make a will to their benefit; or an enforcible contract by Grace to assume a trust in their interest.

A binding agreement to make mutual wills is not established by the fact alone that parties make reciprocal wills with cross-provisions in favor of the survivor (*Edson* v. *Parsons*, 155 N. Y. 555); and the New York Statute of Frauds, as amended in 1933, not only requires " a contract to bequeath property or make a

testamentary provision " to be in writing, but imposes the same requirement for formalization in writing on "a contract to establish a trust". (Personal Property Law, § 31, subds. 7, 8, as added by L. 1933, ch. 616.)

The theory of constructive trust does not depend necessarily upon proof of the actual undertaking of a trust obligation by the party charged. He may have intended to become a trustee, and the proof of his undertaking either is barred by statutory or other rules of evidence, or direct proof of intent may be absent altogether. On the other hand he may have had no intention at all of becoming a trustee.

A constructive trust is not, therefore, merely a judicial creation in substitution for proof of an express trust. Although it may embrace situations where all reasonable probabilities point to an intended trust which cannot be proved, it embraces also situations in which equity spells out a trust not at all intended by the trustee. It is the weight of judicial power that imposes the constructive trust; it is a trust fashioned by the moral mandate of equity.

It will not, of course, be enough that honor and good conscience dictate the party having legal title act justly and fairly in its disposition. Neither in law nor in equity do courts " sit to enforce mere moral obligations " (ANDREWS, J., in *Wood* v. *Rabe,* 96 N. Y. 414, 421). The essence of the equitable doctrine upon which rests the constructive trust is that the court will exercise " its remedial jurisdiction " to prevent the abuse of confidence " when a person through the influence of a confidential relation acquires title to property, or obtains an advantage which he cannot conscientiously retain " (p. 425).

The court was there dealing with property rights between a mother and her son, a relationship which " if not fiduciary in the strict sense, was nevertheless one ordinarily involving the greatest confidence on one side, and the greatest influence on the other " (p. 426).

The Statute of Frauds has often been raised as a barrier both in policy and in formal proof to the fashioning of a constructive trust. But if the considerations which equity would bring within its cognizance were clear enough, considerations such as a relationship of confidence and a strongly implied agreement to take the legal title with an obligation to use it to discharge obligations arising from that relationship, the court in equity would not permit the statute to bar its decree imposing a trust. Such relief would be deemed admissible although the Statute of Frauds would bar the showing of a clear case on which relief on the law side of the court would be available.

"The court does not set aside the act of Parliament", Lord WESTBURY once noted, "but it fastens upon the individual who gets the title under that act, and imposes upon him a personal obligation, because he applies the act as an instrument for accomplishing a fraud." (*McCormick* v. *Grogan*, L. R., 4 E.&I. App. 82, see, also, *Bond* v. *Hopkins*, 1 S.&L. 413). As Judge ANDREWS said in *Wood* v. *Rabe* (*supra*, p. 425), the court in equity "will not permit the statute of frauds to be used as an instrument of fraud".

Even where the words which would make out an express trust are not found in the record, equity in a proper case "will raise out of the situation, from the grouped and aggregated facts, an implied trust to prevent and redress a fraud, and which trust will be unaffected by the Statute of Frauds and may properly be enforced." (FINCH, J., *Goldsmith* v. *Goldsmith*, 145 N. Y. 313, 318.)

The conduct of one having a legal title acquired in a confidential relationship, who denies or withholds rights which should under equitable principles be recognized, itself lies within the term "fraud", as the courts of equity use that term in this context. (*Goldsmith* v. *Goldsmith, supra,* p. 317.) "It would be a reproach to equity if it proved unable to redress such a wrong" Judge FINCH there noted in a case where one son had acquired from his mother title to real estate with an understanding that ultimately the other four children would share in it; an understanding he repudiated after his mother's death.

The "secret trust" of the beneficiary under a will lies within the range of this equitable principle. Such a trust rests on the promise "express or implied" that the legatee "will devote his legacy to a certain lawful purpose"; and equity will compel its application to that purpose (VANN, J., in *Amherst Coll.* v. *Ritch*, 151 N. Y. 282, 323). "The trust springs from the intention of the testator and the promise of the legatee."

Thus the form of the transfer of the property to the person equitably charged as a trustee is not controlling; it may come to him by will or by deed, grant or other form of transfer; the test of confidence and the equitable duty properly to discharge the confidence will be the ultimate guides of judicial action.

There is, of course, a line somewhat between a "mere" moral obligation which, as Judge ANDREWS noted in *Wood* v. *Rabe* (*supra,* p. 421), equity will not enforce at all; and cases where the confidential and moral obligation is so great that, in the words of Judge FINCH in *Goldsmith* v. *Goldsmith* (*supra,* p. 317) "It would be a reproach" to equity if it "proved unable to redress such a wrong".

The point at which equity will impress the trust is not readily definable in general words for out of hand application to future cases. Criteria of various kinds have been set up in the judicial opinions which have been addressed to the problem; but the relationship of confidence between the giver of the property and the receiver upon whom the trust is imposed is certainly basic. In *Sinclair* v. *Purdy* (235 N. Y. 245) Judge CARDOZO regarded " a confidential relation " between a brother and sister to have been " the procuring cause of the conveyance " (p. 253).

There is, beyond this basic element of confidential relationship, a complex of other circumstances which may guide the court in the direction of determining that there is a constructive trust which equity will raise " from the grouped and aggregated facts " to which Judge FINCH referred. (*Goldsmith* v. *Goldsmith, supra,* p. 318.) It may sometimes be " a confidence induced " by the " promise and the confidential relation conjoined " that will move the court to act (*Wood* v. *Rabe, supra,* p. 426). " The principle, that when one uses a confidential relation to acquire an advantage which he ought not in equity and good conscience to retain the court will convert him into a trustee, and compel him to restore what he  *  *  *  seeks unjustly to retain, has frequently been applied to transactions within the statute of frauds " (p. 426).

The competence of the court in equity to grant relief in this direction in *Goldsmith* v. *Goldsmith* was seen to arise from " the whole transaction " in that case " including the confidential relation of the parties and its nature as a family arrangement " (p. 318).

These principles guide us in our review of the case now before us. In addition to the fact that the wills of Fulton and Grace Oursler, executed at the same time, made identical residual dispositions of the property coming from Fulton equally among his four children, which would suggest an intention between husband and wife based both on confidence between them and an intramural family understanding about testamentary benefits to be given to their children, that all four children of Fulton would share alike in his estate, there are other important criteria of intention pointing in the same direction.

In a memorandum written by Grace to the lawyer who acted for both of them in making the wills, and attached to a letter by Fulton to the lawyer stating that the unexecuted draft of his will was correct, Grace made certain suggestions for change in the unexecuted draft of her will. They were forwarded to

the lawyer with Fulton's own will and Fulton necessarily knew what they were.

Those suggestions are significant on the nature of the true understanding between the husband and the wife which, in turn, is the vital point in this case. Among other things Grace stated that "Most of any estate I leave will probably be his earnings and effects and I wish it to be disposed of through me as he would do it himself."

She then indicated in an expression which now seems to be of prime importance, that, although she wanted her own personal estate to go to her own children of the marriage with Fulton, the estate coming from Fulton's property would in her will go to them and to the children of Fulton's first marriage equally.

In this context her memorandum stated that if Fulton did not survive her "I would wish my estate handled as he would wish matters to be handled, except that anything of my own would go directly to my own children and grandchildren, knowing that my husband's loved ones have been, are and will be well remembered".

Earlier in the memorandum she had stated in connection with her suggestions in the draft relating to the children of the first marriage and her own children, that this was "as he [Fulton] would wish it." Of large moment, in our view of the trust growing out of the confidence between husband and wife, is the fact that in Grace's will as actually executed with Fulton's on March 16, 1951, in connection with the division of the residuary among the four children, she stated that this was "as he would wish it."

The evidence is very strong in the record, and uncontradicted, that Fulton treated the four children of both of his marriages with equal affection and esteem. There is proof that Fulton stated on two occasions in Grace's presence, after the execution of their reciprocal wills, that they had disposed of their property in such manner that the survivor would hold certain stock, then under discussion, for the benefit of Fulton's four children and his grandchildren. After Fulton's death there is proof of an admission by Grace that "she was obligated to take care of Fulton's properties for his four children." There is other proof in the same direction.

On the whole record we are thus of opinion that Grace took the property by Fulton's will in a relationship of confidence from which Fulton believed she would dispose of the property "as he would do it himself"; and that it was the implicit understanding between them that such a distribution was an obligation, based on confidence, which Grace undertook. The

imposition of a constructive trust upon the estate of Grace is thus well grounded in equitable principle. We see no undue difficulty in the execution of the decree which in the final analysis is a matter of computation.

The judgment should be affirmed, with costs to respondents.

M. M. FRANK, J. (dissenting). The defendants appeal from a judgment, after trial, which impresses a constructive trust in favor of the plaintiffs, who are the two children and the three grandchildren of the first marriage of Charles F. Oursler, better known as Fulton Oursler, on that part of the estate of Grace Oursler, his second wife, as would have passed to the plaintiffs under paragraph B of article II of her will, dated March 16, 1951. It should be noted, at the outset, that this action is not one for specific performance or to enforce an agreement for mutual and reciprocal wills.

The plaintiffs, William Charles Oursler and Helen O. S. Balaber, are the children of Fulton Oursler by his first marriage. In 1925, he married for the second time and by that marriage to Grace Perkins Oursler there were two children, the defendants, April O. Armstrong and Charles Fulton Oursler, Jr.

In 1951, Grace and Fulton Oursler consulted their attorney, a member of a reputable law firm, with reference to planning their estates and preparing their wills. Proposed wills were drafted by a member of the firm, expert in such matters, and forwarded to the parties. Fulton approved his will, but Grace, in a note in her handwriting, requested some changes. She expressed a desire to bequeath all her property to her husband absolutely and forever, in the same manner as Fulton had provided for her in his will. To that extent, at least, there can be no implication that the survivor received property other than as an outright gift. The language she used was indicative of her complete ignorance of legally permissible devises, and her reference to "tokens of remembrances" to the plaintiffs and others, may well negate any inferences of an agreement for reciprocal wills or for a trust arrangement.

The wills, as finally executed, were substantially similar, but contained no provisions indicating that they were to be mutual or reciprocal documents. Moreover, no independent written agreement for mutual wills or for the creation of a trust was ever executed.

Fulton died in 1952 and his will, devising all of his property outright to Grace, was duly probated. On January 21, 1955, Grace executed a new will, revoking the one made in 1951, and in the new testament she made no provision for the plaintiffs.

She died in 1955 and the will executed that same year was admitted to probate on January 3, 1956. Thereafter this action was commenced against the executors of the estates of both Grace and Fulton.

If, as the plaintiffs claim, a trust was created by a valid promise made by Grace to hold Fulton's property devised to her for specific purposes, it cannot be argued that the trust came into being at any time other than at Fulton's death. Under the circumstances, it is significant that no action was commenced to impress the trust until after Grace's death some years later.

The action was tried on the issues raised by the third amended complaint. The second amended complaint, which it superseded, was predicated upon an agreement between Grace and Fulton Oursler to make reciprocal wills for the benefit of the children of both his marriages. Under the abandoned complaint, the plaintiffs were foredoomed to failure because of the bar of the Statute of Frauds to such an oral agreement. Moreover, reciprocal wills, standing alone, do not evidence a contract between testators or a representation that the survivor will not alter or revoke his will (*Edson* v. *Parsons,* 155 N. Y. 555).

The plaintiffs' theory at the trial was that Fulton Oursler bequeathed his property to Grace upon an express agreement that she would hold it in trust, two thirds for the benefit of the children and one third for the grandchildren of both marriages.

The general principle involved in this litigation is clearly expressed in many decisions. Judge CARDOZO, at Special Term (*Golland* v. *Golland,* 84 Misc. 299, 306), stated it thus: "where a devise is induced by the promise, express or implied, of the devisee, to devote the gift to a lawful purpose, a secret trust is created; and equity will compel him to apply the property in accordance with the promise by force of which he procured it * * * It is not the promise only, nor the breach only, but the promise and the breach combined with the extortion of the property from the owner upon the faith of the engagement, which puts the court in motion". (See, also, *Ahrens* v. *Jones,* 169 N. Y. 555; *Amherst Coll.* v. *Ritch,* 151 N. Y. 282; *Hermann* v. *Ludwig,* 186 App. Div. 287, affd. 229 N. Y. 544; *Matter of Buehler,* 186 Misc. 306, affd. 272 App. Div. 757).

The trial court properly decided that the proof did not establish a promise sufficient to create an express trust. Our problem is to determine whether the proof is sufficient to establish a constructive trust. I think it is not.

There was no proof that Fulton ever saw Grace's memorandum or acted in reliance thereon. The writing is not instinct with a promise or an agreement to take Fulton's estate in trust.

Nor does it meet the test specified in *Matter of Levin* (302 N. Y. 535, 541) that the writing "must be by and of itself a complete expression of the intention of the parties without reference to parol evidence (*Stulsaft* v. *Mercer Tube & Mfg. Co.*, 288 N. Y. 255)."

The eminent lawyer consulted by the decedents testified fully. Objection to his testimony, based on section 353 of the Civil Practice Act was overruled. I agree that it was properly received. His testimony, given full credence as it should be, does not prove an agreement by Grace to take Fulton's property in trust for the children. Counsel stated that he had several discussions with the parties and "went over the planning of the estates in relation to the flow of property from Grace to Fulton, Fulton to the children; from Fulton to Grace, Grace to the children. * * * I don't remember a single definite word that anybody said to me and the letter doesn't even refresh my mind much on that question."

As already indicated, the 1951 wills were drafted by a member of the firm, after consultation with the parties. That partner was present at the trial but was not called as a witness by counsel for the plaintiffs. I find it significant that the office records pertinent to this matter were not sought by the plaintiffs. Certainly it is a fair inference that in a large law office, some work sheets, diary entries or other memoranda would be available, to establish or assist in proving an agreement to hold the property in trust, if one was made. Nor is the conclusion unreasonable that if there was an agreement for mutual wills, or for the devising of property in trust, there would have been writings in fulfillment of statutory requirements providing therefor. The absence of such documents speaks strongly for the nonexistence of a promise creating a secret trust.

The two adult plaintiffs testified that at the reading of Fulton's will, Martin F. Armstrong, Jr., an attorney and the husband of the defendant April Oursler, requested them to sign waivers, stating that Grace would hold the property she received, for all the children and grandchildren. Armstrong denied the statements attributed to him.

John C. Farrar, a friend of Fulton for 30 years, who knew Grace and the children quite well, was permitted to testify to a conversation with Fulton, when Grace was not present. Farrar stated: "He [Fulton] said that one never knew what would happen. They were going abroad and that they had made an arrangement, I cannot remember whether he said will or not, this is an odd thing, but I can't; but that they had made an arrangement so that if anything happened to either of them the

children — four children — would be taken care of. And as I remember it he said it was in trust. I do not remember his exact wording."

Henry Denker, friendly with Fulton and the plaintiff, W. C. Oursler, testified that in connection with the unconsummated formation of a corporation, in the course of which Fulton requested a certain stock arrangement, Fulton explained that he and Grace had executed wills according to which the survivor would take the stock in the enterprise to be held for the four children and the grandchildren. At best, this testimony bears on an agreement for reciprocal wills, an issue abandoned by the plaintiffs. Nevertheless, the agreement as drafted contained no reference to reciprocal wills. Although Denker testified that Grace entered and left the room during the conversations, he uttered not a word at the trial as to her acquiescence in any of the statements attributed to Fulton. He testified that after Fulton's death, Grace told him she would not consummate the transaction because she was "obligated to take care of Fulton's properties for his four children".

In sum, the proof consists of a piecing together of the provisions of the 1951 wills with general statements of intention and vague and indefinite discussions concerning the testamentary desires of Fulton and Grace. Thus the testimony offered has little probative force binding Grace to a constructive trust agreement. Evaluating the proof in a light most favorable to the plaintiffs, I must conclude that what they have sought to do, and successfully so far, is to engraft upon Grace's estate, an unenforcible, incomplete and invalid arrangement for mutual wills in the guise of a constructive trust. Nor does the evidence rise to a firm commitment for mutual wills, absent the Statute of Frauds. At best it indicates a mere testamentary intention in each, and a hope or expectancy on the part of the other. Under such circumstances the proof was insufficient (*Frankenberger v. Schneller*, 258 N. Y. 270).

Before a court of equity declares a constructive trust upon oral testimony, there should be a clear, positive and definite proof of the alleged trust. (*Wallace* v. *Wallace*, 216 N. Y. 28, 39; *Tracy* v. *Danzinger*, 253 App. Div. 418, 421, affd. 279 N. Y. 679.) Not alone is there a failure to establish a constructive trust by clear, positive and definite proof, but, in my view, the evidence is so inadequate that it does not attain the level of a prima facie case. "Insufficient evidence is, in the eye of the law, no evidence." (Quoted by Cardozo, J., in *Matter of Case*, 214 N. Y. 199, 203, from *Pollock* v. *Pollock*, 71 N. Y. 137, 153.)

We should not approve this attempt to circumvent the Statute of Frauds. Even before it was amended in 1933, it was the rule that testimony offered against a decedent's estate required careful and critical scrutiny (see *Matter of Block,* 258 App. Div. 342, 346 and cases cited). It is a fair assumption that when the Legislature enacted the amendment, it was aware of the cases cited in the opinion of my distinguished colleague, Mr. Justice BERGAN, which had all been decided before the statute was amended.

There are other indicia in this record that point to the plaintiff's resorting to the device of a constructive trust for the purpose of achieving the effect of an agreement for mutual or reciprocal wills. Although the theory at the trial was a trust agreement, the prayer for relief, probably adopted *in toto* from the second amended complaint, sought the specific performance of the pertinent provisions of Grace's revoked 1951 will. In consonance therewith, the judgment imposes a trust not alone on all of Fulton's property devised to her, but on what may well be the bulk of her estate. It requires the executors to account for property bequeathed to the plaintiffs by a will unenforcible as a testamentary document. Moreover, the result strips Grace's estate of the income from and the increment to the property she received from Fulton, despite the complete lack of proof that the income from Fulton's estate was to inure to anyone other than Grace.

There is another serious consequence flowing from the erroneous application of the principle of constructive trusts to this case, which, if anything, is one involving an alleged breach of an agreement for reciprocal wills. The determination deprives Grace, as the surviving spouse, of her statutory right to a share in Fulton's estate, as in intestacy (Decedent Estate Law, § 18). Fulton, himself, could not have accomplished that by eliminating her as a beneficiary under his will. Nor would an oral waiver of her right to elect against the will have been effective. Yet, by finding a constructive or secret trust upon oral proof, the judgment entered thereon achieves that result and in that respect circumvents the statute.

In *Matter of Buehler* (186 Misc. 306, 313, 314) an effort was made to impress a trust, as here, upon all the property a widow owned at the time of her death including that received from her husband. It was held the relief sought was too broad. The court said: "equity would not be warranted * * * in impressing a trust upon all of deceased's property (*Rasetter* v. *Hoenninger,* 214 N. Y. 66; *Leary* v. *Corvin,* 181 N. Y. 222; *Seaver* v. *Ransom, supra*)."

206

Although *Rubin* v. *Irving Trust Co.* (305 N. Y. 288, 298–299) treated with an oral contract to make a will, the language used by the Court of Appeals may well be applied here. It was there stated that " The nature of the contract is such that actions for its enforcement are instituted after the death of the promisor and consequently the difficulty of disputing the claim is enormous. Since claims based upon such oral contracts are frequently asserted and are unusually suspect * * * the dangers of injustice are as great as those which militate against the allowance of oral wills."

For all of the foregoing reasons, I am constrained to dissent, and to hold that the plaintiffs have failed to sustain their cause of action. The judgment, therefore, should be reversed and the complaint dismissed.

BREITEL, J. P., RABIN and McNALLY, JJ., concur with BERGAN, J.; M. M. FRANK, J., dissents in opinion.

Judgment affirmed, with costs to the respondents.